UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

LAZARO GILOCOMPO,                                        :

                   Petitioner,                          :

     -against-                                            :

DARWIN LACLAIR, Superintendent,                         :
   Department of Corrections and Community
   Supervision,                                         :

                 Respondent.                          :

------------------------------------------------------------------------x

## PETITION FOR A WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

     To the Honorable Judge of the United States District Court for the Eastern

District of New York:

## PROCEDURAL HISTORY

     1.     Petitioner was convicted in the Supreme Court of the State of New

York, Queens County.

     2.     The date of the judgment of conviction was June 20, 2012, as amended

June 22, 2012.

     3.     Petitioner was sentenced under three counts of one indictment.  He was

not sentenced on more than one indictment in the same court at the same time.

16-CV-4963

4. Petitioner is currently incarcerated in the custody of the New York State Department of Corrections and Community Supervision, DIN 12-A-3078, while he serves a 7-year prison term.

5. Petitioner was convicted, after a jury trial, of two counts of robbery in the second degree [N.Y. Penal Law §§ 160.10(1), (2)(a)] and one count of assault in the second degree [N.Y. Penal Law § 120.05(2)] (Hollie, J., at trial and sentencing).

6. The facts of petitioner's appeal from the judgment are as follows:

(a) Petitioner appealed his conviction to the Appellate Division of the Supreme Court of the State of New York, Second Department.

(b) The Appellate Division affirmed petitioner's conviction on February 25, 2015. People v. Gilocompo, 125 A.D.3d 1000, 4 N.Y.S.3d 288 (2d Dep't 2015). A copy of that decision is attached as Exhibit A.

(c) Copies of the Brief for Defendant-Appellant, the Brief for Respondent, and the Reply Brief for Defendant-Appellant are attached as Exhibits B, C, and D.

(d) Leave to appeal to the New York State Court of Appeals was denied on June 30, 2015. People v. Gilocompo, 25 N.Y.3d 1163, 15 N.Y.S.3d 296 (2015). A copy of the leave application is attached as Exhibit E, and a copy of the decision is attached as Exhibit F.

## STATEMENT OF FACTS

Introduction

Petitioner Lazaro Gilocompo and a codefendant, Rodolfo Rodriguez, were jointly tried for an assault and alleged robbery on 98th Street between 37th Avenue and 38th Avenue in Queens, New York.  The only identification evidence was the complainant's pre-trial showup identification following the incident, and his description at trial of two Hispanic men, one wearing a black jacket and the other, who was six to eight inches shorter, wearing a dark hoodie.  The evidence at trial revealed that there was only a one-inch difference in height between petitioner and Rodriguez.

Before trial, petitioner's attorney moved to preclude the People from introducing Rodriguez's post-arrest oral statement, which accused petitioner of initiating the crime.  Counsel argued that admitting the statement would violate petitioner's right to confront his accusers if Rodriguez did not testify.  The court ruled that the People could elicit from the detective who took the statement that Rodriguez had said that he was near 37th Avenue and 100th Street or 101st Street, that petitioner was also there, that Rodriguez punched a man, and that Rodriguez and petitioner ran and got into a cab.  Neither the discussion nor the ruling addressed the admissibility of Rodriguez's written statement, in which he included details tracking the allegations charged in this case, and suggested that a second participant was responsible for any robbery that may have occurred.

At trial, the detective recounted Rodriguez's oral and written statements and also testified that petitioner made an oral statement that he tried to break up a fight in which Rodriguez was involved on 97th Street, before getting into a cab at 103rd Street.   Another officer was called to establish that, after his partner had a conversation with a man named Miguel Lopez, who did not testify, the officers followed a cab that Lopez pointed out and apprehended its passengers: petitioner and Rodriguez.   Counsel failed to object either to testimony about Rodriguez's written statement or about the police conversation with Lopez.   Counsel also failed to request, and the court did not give, any limiting instruction during trial or in its charge to the jury that Rodriguez's statements were not to be considered as evidence against petitioner.

During his opening statement and in summation, the prosecutor argued that the defendants' statements viewed in tandem amounted to a joint confession, to which counsel made no objection.   Despite conceding that there was no evidence of this in the record, the prosecutor also asked the jury to "infer[]" that the defendants had been followed from the scene by non-testifying witnesses who never lost sight of them and identified them to police.   Counsel made no objection to these arguments.

After protracted deliberations, the jury acquitted both defendants of first-degree robbery, but convicted them of second-degree robbery and assault.

On appeal, petitioner argued that the use of Rodriguez's statements, as evidence in chief and by the prosecutor in summation, violated his constitutional right

to confrontation, and that trial counsel was ineffective for failing to object.   The Appellate Division determined that there was no confrontation error and summarily rejected petitioner's ineffective assistance of counsel claim.   The New York Court of Appeals summarily denied petitioner's application for leave to appeal, in which he raised the same arguments.   Thus, although the confrontation claim raised herein is procedurally defaulted because it was not preserved at trial, petitioner's counsel's ineffectiveness constitutes "cause and prejudice" for the default, which allows this Court to reach the merits of the claim.   Separately, petitioner asserts that his related, but more extensive ineffective assistance of counsel claim was fully exhausted.

<u>The Court's Ruling Regarding a Non-Testifying Witness's Identification</u>

Before jury selection, defense counsel argued that the unavailability of Miguel Lopez, an identifying witness, posed a confrontation problem.   Counsel explained that Lopez had provided "testimonial evidence . . . at the scene" by pointing police to the cab in which petitioner and Rodriguez were found, which then led to the identification procedure with the complainant, Manuel Pucci (P. 10-11).[1]   Because "the incident had been completed" by that time, there was no ongoing "emergency" and, thus, "the only reason . . . for eliciting this information from [Lopez]" was for

---

[1]   Parenthetical numbers prefixed by "P" refer to pages of a pre-trial transcript dated February 1, 2012; those without prefix refer to pages of the trial transcript.   Petitioner's last name is incorrectly spelled as Gil-Ocompo in the transcript and the complainant's last name is sometimes spelled as Puchi.

"use[] later in prosecution" (<u>Id.</u>).   Accordingly, counsel argued, if Lopez's point-out was elicited at trial, petitioner's inability to cross-examine Lopez would violate <u>Crawford</u> v. <u>Washington</u>, 541 U.S. 36 (2004) (P. 10-12).   The only remedy counsel requested, however, was to reopen the suppression hearing and conduct an independent source hearing as to the reliability of Pucci's showup identification (<u>Id.</u>).

The prosecutor responded that Lopez's unavailability was irrelevant to the suggestiveness of the showup, but promised, "the People are not going to seek to introduce any hearsay evidence that would bring the confrontation clause into effect" (P. 14).   When the court asked how the prosecutor planned to address the circumstances of the arrest, he stated:

> I was going to limit my questioning on direct to the officers, they responded to 103 and Roosevelt Avenue.  At that point, they had a conversation with a civilian, did that civilian give you a name?  Yes, Miguel Lopez.  And after having a conversation with that civilian, what police action or what happened next and then we will go into the taxi stop (P. 15-16).

The prosecutor also planned to elicit from police witnesses "their efforts to locate" Lopez (P. 16).   The court accepted this plan and defense counsel did not respond or object (P. 16).

<u>The Motion to Preclude Codefendant's Post-Arrest Statement</u>

Before opening statements, petitioner's attorney advised the court that she had learned that the People planned to call a detective who would testify to an oral post-

arrest statement made by petitioner's codefendant, Rodolfo Rodriguez (440).  Counsel argued that allowing the detective to testify about the oral statement would create a "Crawford situation" and "violate [petitioner's] right" because she would not have an opportunity to cross-examine Rodriguez (440).

According to the prosecutor, Rodriguez had stated that

> he was in the vicinity of 101st Street an[d] 100th Street by 37th Avenue when [petitioner] ran up to the guy and grabbed him as if he was going to rob him.  "The incident got out of control when the guy resisted, that's when I tried to help [petitioner] and I punched the guy one time.  I heard a bunch of people yelling, so, I ran on foot and got into a cab" (441).

Saying he would restrict the detective's answers to Rodriguez's conduct (440), the prosecutor intended to elicit that Rodriguez had stated he was "in the vicinity . . . with [petitioner] and that he, during an incident, punched the complainant or the man that was there, and then he heard people yelling, and he fled, and he got into a cab" (441-42).  Rodriguez's attorney objected that there was "really nothing in the oral statement where he sa[id] he was with" petitioner, and to frame it that way would be misleading (442).  The prosecutor explained, "I had a little bit of a concern about using the word 'help,' because that also goes into acting in concert and the like.  So, instead of saying that he was helping him, I was going to [e]licit that they were together" (443).

After an off-the-record discussion, the prosecutor recounted petitioner's alleged oral statement as follows: "[I] was in the area of 97th Street when Rodriguez

got into a fight and I tried to break it up. . . . I ran on foot and got into a ca[b] in the vicinity of 103rd Street" (443-44).   Ultimately, the court ruled that the prosecutor could elicit that Rodriguez had told police that he was "present at . . . a certain time and place, that there was a man there, that [petitioner] was there, that he, Rodriguez, punched the guy and then they ran and got into a cab" (444).   Counsel did not object (444).

Although reference was made to Rodriguez's having made a written statement (443), there was no discussion of its admissibility.

The Prosecutor's Opening Statement

Arguing that "[t]he two men that robbed [the complainant] had already been introduced to" the jury and that "[t]hose two men were Rodolfo Rodriguez and Lazaro Gil-Ocompo," the prosecutor described each defendant's alleged role in the crime (452-55).   The prosecutor also told the jury that it would hear about two people who intervened and chased Rodriguez and petitioner from the scene (454-55). Afterward, the police "had a conversation with" Miguel Lopez, and "after speaking with him," they stopped a taxi in which Rodriguez and petitioner were passengers (455).   Following their arrest, according to the prosecutor, "both defendants admitted that they were there" but said "this was just a fight" (455-56).   Counsel never objected that petitioner had not admitted fighting with the complainant, or that Rodriguez's admission could not be used against both defendants.   Counsel also did not object to

8

the implication that Lopez—who counsel knew would not testify at trial—had identified petitioner to the police.

In a cursory response, defense counsel did not dispute petitioner's involvement in the charged crime nor assert that Rodriguez's admission was not evidence against her client; she simply urged the jury to find that there was no robbery (457-59).

The State's Case Against Petitioner

At approximately 9:20 a.m. on October 16, 2010, Manuel Pucci was suddenly attacked by two strangers while he was walking to work on 98th Street between 37th and 38th Avenues in Queens (464-65, 468-474, 514-15). The entire incident happened "very quickly": one of the men stood behind Pucci and used his arm to hold him by the neck as the other man immediately and repeatedly punched Pucci in the head and face (475-78, 508, 518-19). Meanwhile, the man behind Pucci went into one of his pockets and removed $100 (479-80, 496-97). The man in front then hit Pucci with what he believed to be a brick, causing Pucci to fall (477-78, 484-85, 555). Although he described seeing his assailants chased from the scene by two neighbors responding to his screams for help, Pucci also testified that he "blacked out" for about two minutes (485-90, 494-96, 537-42).

The People's only other eyewitness, Janeth Pucha, was drawn to a window of her home on 98th Street by Pucci's screams and watched until the assailants left, chased by two neighbors who came out of their homes (Pucha: 703, 705-09, 711-13,

716).  Pucha, who was not contacted by law enforcement until months later, recalled observing two men "beating" a third, shorter man (707-11, 719).  She remembered both men going through the third man's pockets, and saw one of them hit him with what appeared to be a rock (710-11).

Pucha called the police and a bystander on the street called 911 for Pucci, who was an undocumented immigrant from Ecuador and did not speak English (Pucci: 495-97, 524-25; Pucha: 713).  That bystander waited for police with Pucci and Police Officer Shondell Pollard arrived about five minutes later (Pucci: 496-97; Pollard: 580-86).  Pollard was responding to a radio run reporting a robbery in progress with two black men as the perpetrators (582-84, 587, 611-12, 640-43).  When Pollard asked Pucci what had happened, the bystander translated Pucci's answers from Spanish to English, and told Pollard that Pucci had been robbed of a wallet containing $600 (Pucci: 496-97, 517-18, 523; Pollard: 586-87, 595, 612-13, 626, 639, 644).  Pollard did not speak or understand Spanish (Pucci: 497; Pollard: 587).   Pucci testified inconsistently as to whether he understood what the bystander and Pollard said when they spoke in English (517, 550-51, 556).

Sergeant Brian McMenamin also responded to the same radio run but left the scene without speaking to Pucci, to respond to a second radio run at 9:30 a.m. reporting a robbery in progress at Dunkin' Donuts on 103rd Street and Roosevelt Avenue, approximately five blocks and two avenues away (McMenamin: 561, 563-65, 574; Pollard: 588-89).  McMenamin reached Dunkin' Donuts within a minute and

approached with his partner (565-67, 574-75). Before they entered, a person they later learned to be Miguel Lopez stopped them and had an "animated" conversation with McMenamin's partner in Spanish, pointing at a taxi that was traveling on 103rd toward Roosevelt (567-69, 575-78). McMenamin, who did not speak Spanish, did not know what they said (576). Lopez did not testify.

McMenamin and his partner returned to their car to follow the taxi after it turned onto Roosevelt, heading toward 98th Street (568-70). They were soon joined by Pollard, who had also responded to the second radio run after leaving Pucci waiting for an ambulance to treat his still-bleeding head and facial injuries (McMenamin: 569; Pollard: 584, 586, 588-89, 612-14, 631, 639). McMenamin directed Pollard to assist in stopping the cab, which Pollard learned was related to the first radio run (McMenamin: 569-70; Pollard: 587-90, 613-15). McMenamin testified that he never lost sight of the cab pointed out by Lopez (570).

McMenamin and Pollard stopped the taxi a block from where Pucci was attacked, and discovered petitioner and Rodriguez in the rear seat (McMenamin: 570; Pollard: 590-91, 597). They removed them from the cab, handcuffed them, and placed them side-by-side, leaning against the cab in anticipation of a showup identification procedure (McMenamin: 570-71, 578-79; Pollard: 591-93, 615-18). A search of the defendants and the taxi did not turn up any money or weapons (Pollard: 593, 617).

11

Pollard testified that she unsuccessfully canvassed for physical evidence in the vicinity of the crime, looking for the stolen property and object allegedly used to hit Pucci, but did not document this search in her notes (593-94, 618-20, 631-33, 644). She observed blood on a nearby tree and assumed that it belonged to Pucci but did not take a photograph or a sample for testing (594, 632). Pollard did not search for stolen property near the Dunkin' Donuts at 103rd and Roosevelt and did not learn what route Pucci's assailants allegedly took (594). Although Pollard documented that a wallet with $600 had been taken, she testified that she had asked the bystander translating for Pucci how much money he was carrying, not what had been stolen (613, 626-28, 639-40).

The Identification Evidence

Although Pollard testified that the bystander translating for Pucci had described the assailants as two Hispanic men wearing dark clothing, Pucci denied this; he was not asked for a description of his attackers and never gave one (Pucci: 545-46; Pollard: 643-44).

After stopping the cab, Pollard approached Pucci while he was inside an ambulance receiving treatment and informed him in English, without the assistance of a translator, that he "was going to have to come over and identify the people who did this to him" (Pollard: 596, 619). Pucci was escorted by two officers in a patrol car to the scene of arrest to see if he could "recognize the people that beat [him]" (Pucci:

506; Pollard: 597-98, 635).  At least two other patrol cars were present (McMenamin: 571-72, 579; Pollard: 597-98, 617-18).  Pollard then asked Pucci, "are these the guys?" (597-98).  Pollard asked this in English without a translator present "because it seem[ed] like he underst[oo]d a little bit of English" (598-99).  Pollard did not recall whether Pucci responded to her questions, and, if he did so, what language he used (596, 637-38, 646).  Nevertheless, she knew she had "told him that he had to come over and ID these guys" and "knew [she] had a positive ID" (637-38).  Subsequently, petitioner and Rodriguez were arrested (McMenamin: 571-72; Pollard: 599).   In response to leading questions, Pucci testified that he recognized them as his attackers in the showup by their faces and clothing and was "sure" of his identification (505-08).  He recalled being asked, "Is that them," and responding, "yes" (546).

At the time of the showup, Pucci had a split lip and a bloody, fractured nose, such extensive facial swelling that his left eye was completely swollen shut, and a bleeding head injury (Pucci: 508-10, 518-19, 535-37; Peo. Exs. 1-3).  He was very dizzy, his face was in "a lot" of pain, and he had a headache that was exacerbated by the movement from the car as he was driven to the showup (544-45, 549).  In Pucci's version of events, he did not receive any medical treatment prior to the identification (546-49), and was taken to identify his attackers before the ambulance even arrived (519-23).  In the ambulance, the technicians had Pucci lie down while holding a sponge to the left side of his face to absorb the blood (519-22).  Pucci's face

13

continued to swell and he did not receive any pain medication during his on-site treatment (522).

At trial, Pucci did not identify petitioner or Rodriguez (474-75).  In describing his attackers, Pucci said only that they were two Hispanic men six to eight inches apart in height and that the taller man, who held Pucci from behind, wore a black jacket while the shorter one wore a black hoodie (474, 530-31).[2]  Pucha conceded she never saw the assailants' faces but nonetheless knew they were "Latin" from the color of their hands; she also recalled that one wore a hoodie (709-10, 723-24).

<u>Rodriguez's and Petitioner's Arrests and Statements to Police</u>

During arrest processing, Pollard documented petitioner's height as 6' and Rodriguez's as 5'11" (600-01, 603).  Pollard and Detective <u>Michael Fischer</u>, who interviewed petitioner and Rodriguez after their arrest, did not recall observing blood on their clothing (Pollard: 538; Fischer: 701).  Fischer agreed that it was fair to infer that there was no blood because the clothing otherwise would have been confiscated as evidence (701-02).  Blood was not visible in the arrest photos of petitioner, who was wearing a black jacket over a white t-shirt, and Rodriguez, who was wearing a dark hooded jacket (606-11; Peo. Exs. 4-5).

---

[2]  Pucha testified that the men were taller than Pucci, who was 5'3" (Pucci: 461), but she was not asked whether there was a height differential between the two assailants (Pucha: 709-10).

Fischer was assigned to "enhance" the investigation by interrogating petitioner and Rodriguez (652-53, 686-87).  Fischer had already learned from Pollard that a wallet with $600 had been taken, a hard object was used during the incident, a taxi was involved, and something happened near 103rd Street (Fischer: 652-53, 669, 687-88).  Fischer questioned Rodriguez and petitioner separately at the precinct (Pollard: 604-05; Fischer: 654-55, 670-71, 689).  Fischer claimed that both made oral statements, but did not memorialize either of the alleged statements until four days later, and he admitted to working on other investigations in the interim (663-64, 680-82, 699-700).

At trial, the prosecutor repeatedly elicited from Fischer that Rodriguez said petitioner was with him while admitting his own culpability in an incident in the same "vicinity of" Pucci's attack:

> [PROSECUTOR]: And what did defendant, Rodriguez, tell you as to the location of this incident?
>
> [FISCHER]: It was in the area of 100th and 101st Street and 37th Avenue.
>
> [PROSECUTOR]: Did you have a conversation with respect to who he was with at that time?
>
> [FISCHER]: Yes.
>
> [PROSECUTOR]:  What did he tell you?
>
> [FISCHER]: It's the codefendant, Gil-Ocompo.
>
> [PROSECUTOR]: Did he call him by his first name?
>
> [FISCHER]: I don't recall the exact name used, but he referred to him, yes.

> [PROSECUTOR]: Did he tell you what happened during this incident?
>
> [FISCHER]: Yes.
>
> [PROSECUTOR]: What exactly did he tell you that he did?
>
> [FISCHER]: He was with the codefendant, Gil-Ocompo, in the vicinity of 101st Street … [and] he did punch another person and he heard a crowd yelling.  He ran and got into a cab (663-64).

Rodriguez memorialized what he told Fischer in a written statement that was admitted into evidence:

> ~~I dint do nutting~~ I punch a guy one time then I ran but I dint robed no one dint take [illegible] or hit hime whit a brick.  Am sorry for punching hime but I dint wanted to go like that ~~that guy~~ and I dint take any ting frome that guy.  I only punch whit my hand not a brick wen I punch the guy.  I herd people scriming so I ran the wen I got 2 long we got on a cab and that wen we got ~~arested~~ arrested.  I dont know what was taken frome that guy and I tink not 100% no one tooke frome hime any ting.

(664-67; Peo. Ex. 7). [3]  Fischer could not recall whether he specifically asked Rodriguez about a brick, but he "could have made that an example" (668-70).  Petitioner's attorney did not object to the admission of Rodriguez's written statement or ask for a limiting instruction for either the oral or written statement.

Fischer also testified that petitioner orally stated that "he was in the area of 97th Street with the codefendant, Rodriguez, and he went to -- He stated that he fled

---

[3]  In the transcript, punctuation was added to this statement.  The version admitted into evidence is attached hereto as Exhibit G.

on foot and got into a cab in the vicinity of 103rd Street" (680, 696).  Fischer added that petitioner had said that Rodriguez was in a fight near 97th Street and that he was trying to break up that fight before he fled and got into a taxi (681-82).  Petitioner could not write in English or Spanish, and Fischer did not write down the statement to read back to petitioner (682-83, 693).  Fischer also did not audio- or video-record the oral statements of either petitioner or Rodriguez, and there was no other witness to their alleged oral statements (693-94).

The *In Limine* Ruling Precluding Testimony About Efforts to Locate Lopez

Before the People rested, they sought to call a detective to testify to their efforts to locate Lopez and present him as a witness (732).  Counsel for both defendants objected because, inter alia, there was no proffer as to the substance of Lopez's testimony and the detective's testimony would inflate his importance (732-34).  Acknowledging that it would violate Crawford and the hearsay rule to elicit exactly what Lopez told police, the prosecutor argued that they should be able to demonstrate that his absence at trial was due to his failure to cooperate and not to the People's lack of diligence in "tr[ying] to find . . . and get him to testify" (734-35).  The prosecutor also noted that there was enough evidence at trial for the jury to infer "who Miguel Lopez was in connection to this case" (734).

The court ultimately precluded the detective's testimony (736-38).  In response, the prosecutor said that if the defense attorneys remarked on Lopez's absence in

summation, he would move to reopen the People's case and call both the detective at issue and the currently unavailable police officer who had actually spoken with Lopez to establish the People's efforts to call him as a witness (739).  The court replied only that it did not believe Lopez would be mentioned in the defense summations, and petitioner's attorney said nothing (739).

Summations

In summation, counsel for petitioner argued that the People had not met their burden of proof due to inconsistencies and holes in the People's evidence, including the lack of physical evidence such as blood on petitioner's clothing (753-54, 762-66, 770).  Counsel emphasized that no one had identified petitioner in court and that Pucci had described a six-to-eight-inch height difference between his assailants, while petitioner and his codefendant differed by only an inch in height (757, 761-62, 770).  She also argued that, due to his injuries, Pucci was unable to make a reliable identification at the time of the showup, and that he identified petitioner and Rodriguez—the only two people presented to him—because he was anxious to get away from the police as quickly as possible for fear they would discover his undocumented status (755-61).  Counsel pointed out that the location of the car stop indicated that petitioner and Rodriguez were not responsible because it would not have made sense for them to escape the scene of a crime and then get into a cab and head right back to it (764-65).  Finally, counsel disputed that petitioner made the oral

statement attributed to him by Fischer, noting that there was no witness to the interview, and that although Fischer had been tasked with strengthening the investigation, the only statement he allegedly obtained simply duplicated the information he had already been told about the offense by Pollard (766-70).

Counsel for Rodriguez also focused on the unreliability of Pucci's pre-trial identification, the absence of physical evidence, and the discrepancies between the testimony of Pucci and Pucha (771-83, 789-94). In addition, he argued that Pollard's testimony was unreliable because of her mistakes during the investigation of the case, including, inter alia, her attempts to speak with Pucci without an interpreter despite knowing he did not speak English, the inaccuracies in her paperwork regarding what was allegedly stolen, and her inadequate search for physical evidence at the crime scene (780-86). Rodriguez's attorney argued that Fischer's account of the oral statements should be rejected because of his delay in documenting them (786-89).

In a 17-page summation, the prosecutor spent 4 consecutive pages discussing the implicit identification by Lopez and the custodial statements. Asking "what it [made] out of the testimony about the citizens that were on the street" (804), the prosecutor reminded the jury that "citizens" were seen chasing "the defendants" and that the police had a "conversation with a citizen" on 103rd Street (804). He then argued, without objection:

> Now, it's not in the record, ladies and gentlemen, but I am asking you to make reasonable inferences from the evidence that is provided to you. And I submit to you that

> these two (indicating) defendants never left the eyes of
> those citizens.  These (indicating) are the two involved in
> this incident (804).

The prosecutor argued the defendants "knew that they had to distance themselves" after their arrest, and that their alleged post-arrest "statements mean that the defendants knew certain things" (806-07).  The prosecutor elaborated as to "what these statements meant" in his view:

> I submit to you that the defendants themselves admitted,
> yes, we were there with these statements, it was us.  What
> they did do, I submit to you through these statements is
> say, hey, wait a minute.  Yes, it was us, but it was just a
> fight.  Mr. Rodriguez says, I only punched him once.  It
> was us, but I only punched him once (807).

Rodriguez's attorney objected to this "mischaracterization," which petitioner's attorney joined," the court overruled them, and the prosecutor repeated, "I submit to you that this is what these statements mean" (807).  At no point did counsel object that Rodriguez's statements were inadmissible against petitioner or request a curative instruction.

## Charge, Deliberations, and Verdict

As to each defendant, the court submitted to the jury, under an acting-in-concert theory, one count of robbery in the first degree [N.Y. Penal Law § 160.15(3)] (use of a dangerous instrument), two counts of robbery in the second degree [N.Y. Penal Law §§ 160.10(1), (2)(a)] (aided by another; causing physical injury), and one count of assault in the second degree [N.Y. Penal Law § 120.05(2)] (use of a

dangerous instrument) (830-37).  In its charge, the court told the jury it could consider "the statements" as long as it found them to be voluntary (824-26).  The prosecutor had noted at the charge conference that "two defendants are being charged and have to consider it separate" (751), and the court's charge included a general instruction that the jury must consider this case as "two trials in one," "evaluate the evidence . . . [and] instruction on the law" separately for each defendant, and return separate verdicts (830).  It did not instruct the jury that Rodriguez's statements were not to be considered as evidence against petitioner (815-43).  Petitioner's attorney did not request that instruction prior to or after the charge, or object to its omission (750-51, 843-44).

Deliberations spanned four days (844, 881-84; Ct. Ex. 4).  During that period, the jury requested a readback of Fischer's testimony regarding both defendants' oral statements (864-67, 875; Ct. Ex. 2).  The jury also requested and, without objection received, all exhibits, which included Rodriguez's written statement; reinstruction on the elements of each count; and readbacks of the testimony by Pucci and Pucha regarding the assailants going through Pucci's pockets (851-58, 864-67, 877-79; Ct. Exs. 2-3).  The court denied the jury's request for a readback of opening and closing statements by all counsel (864-66; Ct. Ex. 2).  Ultimately, the jury acquitted petitioner of first-degree robbery, but convicted him of two counts of second-degree robbery and one count of second-degree assault (882-87).  The jury reached the same verdict as to Rodriguez (887-90).

21

The Appellate Division's Decision

On appeal, petitioner argued, among other things, that his Sixth Amendment right to confrontation was violated by the introduction through Fischer of Rodriguez's custodial statements and by the prosecutor's summation argument urging the jury to rely on those statements as proof of petitioner's guilt.  Alternatively, petitioner argued that he was deprived of the effective assistance of counsel by his attorney's failure to object to the inadequate redaction of Rodriguez's oral statements, which did not cure the confrontation error; to object to the admission of Rodriguez's written statement; and to demand a limiting instruction regarding Rodriguez's statements.  Petitioner also argued that the prosecutor's closing argument that an uncalled witness had identified him was impermissible, and that counsel was ineffective for failing to object to this and other summation misconduct.

The Appellate Division held that petitioner's confrontation claim regarding the admission of Rodriguez's statements and the prosecutor's use thereof during summation was unpreserved, but concluded, in any event, that it was meritless because "each [of Rodriguez's statements], taken individually, did not directly implicate [petitioner]."  People v. Gilocompo, 125 A.D.3d 1000, 1001, 4 N.Y.S.3d 288, 289 (2d Dep't 2015).  The Appellate Division did not acknowledge the trial court's failure to give a limiting instruction about Rodriguez's statements and summarily rejected all of petitioner's remaining claims.  Gilocompo, 125 A.D.3d at 1001 ("defendant's remaining contentions are without merit").

## GROUNDS OF UNCONSTITUTIONALITY OF PETITIONER'S CONVICTION AND SENTENCE

### POINT I

IN THIS IDENTIFICATION CASE, PETITIONER'S CONSTITUTIONAL RIGHT TO CONFRONT WITNESSES AGAINST HIM WAS VIOLATED WHEN A POLICE WITNESS TESTIFIED THAT THE NON-TESTIFYING CODEFENDANT MADE CUSTODIAL STATEMENTS IMPLICATING PETITIONER IN THE CRIME AND THAT THE PROSECUTOR EXACERBATED THE ERROR BY HIGHLIGHTING THAT TESTIMONY IN SUMMATION AND ARGUING THAT BOTH DEFENDANTS HAD MADE A JOINT CONFESSION.

Petitioner's constitutional right to confrontation was violated when the state trial court admitted his codefendant Rodriguez's post-arrest custodial statements against him at their joint trial, at which Rodriguez never testified. Not only did Rodriguez's statements identify petitioner as a participant in the crime, but they implied that he robbed the complainant while Rodriguez assaulted him, and no instruction was ever given that those statements could not be used against petitioner. Moreover, the prosecutor urged the jury to consider those statements along with petitioner's alleged statement that he tried to break up a fight in which Rodriguez was involved as a joint confession by both defendants. The improper use of Rodriguez's statements against petitioner was not harmless in light of the weaknesses in the People's case. Accordingly, appellant was deprived of his right to confrontation and

his due process right to a fair trial.  U.S. Const. Amends. VI, XIV; N.Y. Const. Art. I,
§ 6; <u>Crawford</u> v. <u>Washington</u>, 541 U.S. 36 (2004).

The Confrontation Clause guarantees a criminal defendant the right to confront all witnesses against him.  In a landmark decision issued nearly a decade before petitioner's trial, the United States Supreme Court categorically prohibited the use of "testimonial" hearsay against a criminal defendant who has not had the opportunity to cross-examine the out-of-court declarant.  <u>Crawford</u>, 541 U.S. at 59. The <u>Crawford</u> Court expressly included confessions and statements taken by police officers during interrogation as examples of testimonial hearsay.  <u>Id.</u> at 51-53, 68-69. Without a doubt, Rodriguez's statements during post-arrest interrogation qualify as forbidden testimonial hearsay and were therefore inadmissible against petitioner.  <u>See</u> <u>McBee</u> v. <u>Burge</u>, 644 F. Supp. 2d 270, 282 (E.D.N.Y. 2009), <u>aff'd</u>, 395 Fed. Appx. 762 (2d Cir. 2010) (<u>Crawford</u> violated by admitting non-testifying witnesses' statements to police without adequate limiting instruction not to use them against defendant); <u>People</u> v. <u>Pagan</u>, 87 A.D.3d 1181 (3d Dep't 2011) (<u>Crawford</u> prohibited use of codefendant's statements to investigator as proof against other defendants at joint trial); <u>see</u> <u>also</u> <u>Richardson</u> v. <u>Marsh</u>, 481 U.S. 200, 206 (1987) ("where two defendants are tried jointly, the pretrial confession of one cannot be admitted *against* the other unless the confessing defendant takes the stand") (emphasis added).

Because no limiting instruction was given and Rodriguez did not testify, the use of his statements against petitioner violated <u>Crawford</u>.  The court never told the jury

that it must not consider Rodriguez's statements as evidence against petitioner (or vice versa), and in fact lumped the statements attributed to Rodriguez and petitioner together when it charged the jury that it must determine whether "the statements" were voluntary before considering them (824-26).  The jury was, therefore, entirely free to consider Rodriguez's statements against petitioner, and was in fact urged to do so by the prosecutor's blatantly improper and misleading argument in summation that the statements viewed together amounted to a joint confession by both defendants (see post).  Cf. Adamson v. Cathel, 633 F.3d 248, 256-59 (3d Cir. 2011) (the Supreme Court has long held that a limiting instruction is *required, not optional*, to prevent a jury from using non-testifying accomplices' statements as substantive proof of guilt against a defendant).

The lack of any limiting instruction ensuring that Rodriguez's statements not be used against petitioner is one of the reasons they were not admissible under Bruton v. United States, 391 U.S. 123 (1968), and its progeny.  Out-of-court statements by a non-testifying codefendant are admissible at a joint trial only if the statements are used against the codefendant alone.  Bruton, 391 U.S. at 123-29 (in joint trial, codefendant's confession was legitimate evidence as to him but inadmissible hearsay as to defendant); see also Richardson, 481 U.S. at 206 ("Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant").

25

And even with proper instruction, a codefendant's statement is inadmissible at a joint trial if it implicates the defendant. Bruton, 391 U.S. at 127-28 (limiting instructions were inadequate safeguard where confession included incriminating references to defendant); see also People v. Wheeler, 62 N.Y.2d 867, 869 (1984) ("When an extrajudicial statement by [a non-testifying] defendant contains incriminating references to another defendant, admission of that statement upon their joint trial" is error). This is true even where, as here, the defendant's own statements are admitted into evidence and are arguably consistent with the codefendant's. People v. Khan, 200 A.D.2d 129, 136 (2d Dep't 1994) (no exception to Bruton where admitted statements by codefendant and defendant are "substantially identical" because "interlocking nature of the confessions would serve to prejudice the defendant, who, as is usually the case, denies the truth of his or her confession at the trial") (citing Cruz v. New York, 481 U.S. 186, 193-94 (1987)).

Only if a codefendant's statement implicating the defendant can be effectively redacted "so that the jury would not interpret its admissions as incriminating the [other] defendant," would the statement be admissible. Wheeler, 62 N.Y.2d at 869; see also Richardson, 481 U.S. at 211. For example, a codefendant's statement may be admitted (against the codefendant only) where it is "redacted to eliminate not only the defendant's name, but any reference to his or her existence." Richardson, 481 U.S. at 211. However, the redaction is clearly insufficient when the statements still "obviously refer directly to someone, often obviously the defendant." Gray v.

Maryland, 523 U.S. 185, 196 (1998).  The burden of effective redaction rests with the People, United States v. Patterson, 2002 WL 31890950, at *9 (S.D.N.Y. 2002), Wheeler, 62 N.Y.2d at 869, and their redaction of Rodriguez's statements in this case failed to remove incriminating references to petitioner.

The jury knew—from the fact that they were seated at the defense table and from the People's opening statement—that Rodriguez and petitioner were accused of being the two men who attacked the complainant, and that the charges included hitting him with a brick and robbing him.  According to Detective Fischer, Rodriguez stated that petitioner was with him when he punched a man in the same area as the charged crime and, although Rodriguez denied personally robbing the man, he was unsure about whether a theft actually occurred.  Rodriguez also mentioned the alleged weapon in this case, denying that he used a brick during the incident.  Thus, since Rodriguez had said petitioner was with him, and there were only two assailants, Rodriguez's denials that he used a brick or robbed Pucci indicated that petitioner must have done so.  And, since petitioner and Rodriguez were charged with acting in concert and only two men were involved in Pucci's attack, it was hardly a leap for the jury to find petitioner guilty simply by accepting Rodriguez's statement that he was with him.[4]  See Eley v. Erickson, 712 F.3d 837, 858-61 (3d Cir. 2013) ("confession

---

[4]  Given that Pucci testified that two men attacked him, as did Janeth Pucha, and that Rodriguez and petitioner were tried together, it was unlikely that Rodriguez's statement *could* have been redacted in a way to avoid the obvious conclusion that Rodriguez was referring to petitioner. See, e.g., People v.

expressly implicated exactly three people in the crimes and exactly three defendants appeared at the joint trial").   Beyond petitioner's mere presence, Rodriguez also implied petitioner's consciousness of guilt by saying they fled together in a cab, (663-66; Peo. Ex. 7).

It is well settled that even an implicit accusation triggers the right to confrontation.  <u>Mason</u> v. <u>Scully</u>, 16 F.3d 38, 42-43 (2d Cir. 1994); <u>see</u> <u>also</u> <u>Eley</u> 712 F.3d at 857 (whether <u>Richardson</u> exempts an incriminating statement from <u>Bruton</u> "depend[s] 'in significant part upon the *kind* of, not the simple *fact* of, inference'") (quoting <u>Gray</u>, 523 U.S. at 196).  For example, implying that a defendant was arrested based on *undisclosed* statements by a non-testifying codefendant is impermissible (<u>see</u> <u>post</u>).  <u>See</u> <u>Ryan</u> v. <u>Miller</u>, 303 F.3d 231 (2d Cir. 2002); <u>Mason</u>, 16 F.3d at 43.  Thus, Rodriguez's confession that he and petitioner were involved in an altercation with a man in the same vicinity as the charged crime and his suggestion that petitioner may have robbed the man and hit him with a brick before they fled together, was facially incriminating.  <u>Gray</u>, 523 U.S. at 196; <u>Eley</u>, 712 F.3d at 858-61.

Any question about whether the jurors could somehow have missed Rodriguez's implicit accusations against petitioner was eliminated when the

---

<u>Jones</u>, 280 A.D.2d 489 (2d Dep't 2001) (redacted statement of codefendant that robbery was committed by "another individual" violated defendant's right to confrontation).

prosecutor openly encouraged the jury to use Rodriguez's statements to find that both

he and petitioner were guilty.  The prosecutor proclaimed:

> I submit to you that the *defendants themselves admitted, yes, we
> were there* with these statements, *it was us*.  What *they did do
> . . . through these statements* is say . . . *Yes, it was us*, but it was
> just a fight.  Mr. Rodriguez says, I only punched him once.
> *It was us* . . . (806-07; emphasis added).

Arguing that petitioner had confessed was highly misleading, as he did not admit any

wrongdoing.  In his alleged statement, which did not include any details that linked

him to Pucci, he said only that he broke up a fight between Rodriguez and someone

else at a different location.  And yet the prosecutor's repeated refrain, "yes, it was us,"

conveyed that both defendants' statements essentially corroborated each other and

should be considered a joint confession.  Cf. Richardson, 481 U.S. at 211 (prosecutor

"sought to undo the effect of the limiting instruction by urging the jury to use

[codefendant's] confession in evaluating respondent's case"); People v. Lopez, 68

N.Y.2d 683, 685-86 (1986) (denial of motion to sever codefendants' trials ruled

retroactively erroneous because court's accidental reference to defendant where his

name was to be redacted rendered "the effectiveness of the redaction . . . all but

negated").

Making matters worse, the court not only failed to give a necessary limiting

instruction but effectively endorsed the prosecutor's improper argument by overruling

defense objections that it was a "mischaracterization" to refer to the statements as a

joint confession (807).   See People v. Baker, 23 N.Y.2d 307, 318 (1968)

("compound[ing] the problem, the prosecutor urged the jury to consider [non-testifying codefendant's] statement against all the defendants. . . . Not only did the trial court not warn the jury against the impropriety of this line of argument, in effect it overruled the objection") (internal citations omitted).

These clear confrontation errors were not harmless.  In the federal habeas context, the government must show that the constitutional errors, viewing the record as a whole, did not have "substantial and injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 623-24, 638 (1993); see also Fry v. Pliler, 551 U.S. 112, 116-21, n. 3 (2007); Brinson v. Walker, 547 F.3d 387, 395 (2d Cir. 2008) (Brecht applies to confrontation error).  In assessing the likely impact, a habeas court should consider the strength of the People's case absent the inadmissible evidence, whether that evidence was material and/or cumulative, and whether it was highlighted by the government.  Brecht, 507 U.S. at 639; Mcbee, 644 F. Supp. 2d at 284.  "[T]he strength of the Government's case is 'probably the single most critical factor.'" McBee, 644 F. Supp. 2d at 284 (quoting United States v. Mejia, 545 F.3d 179, 199 (2d Cir. 2008)).  Here, the factors favor petitioner.

First, and most critically, the case against petitioner was "far from overwhelming."  Brinson, 547 F.3d at 396; see also Khan, 200 A.D.2d at 140.  Pucci made no in-court identification and his pre-trial showup identification was of questionable reliability.  He had never seen his assailants before and "identification of strangers is proverbially untrustworthy."  United States v. Wade, 388 U.S. 218, 228

(1966).  It is also unclear from Pucci's testimony whether he ever saw the face of the man behind him, whom the People alleged was petitioner (474, 802).  Moreover, his attack presented all of the factors that undermine the reliability of an identification: it was so sudden and brief that Pucci had barely any time to observe his assailants, and his attention certainly was diverted from their faces by the incessant strikes to his own.  Pucci's purported on-scene description of two Hispanic men in dark clothing, which he denied giving, was extremely vague.  His description at trial was no better and the only distinctive characteristic—a six-to-eight-inch height disparity between his assailants—did not match petitioner and Rodriguez, who were only one inch apart. See Manson v. Brathwaite, 432 U.S. 98, 115-16 (1977) (opportunity to observe, degree of attention, accuracy of description, and lapse of time are factors relevant to reliability); People v. Chestnut, 19 N.Y.3d 606, 612 (2012) ("vague" descriptions "cast doubt on the accuracy of . . . identification").

Pucci's injuries cast further doubt on the accuracy of the showup identification. His face had extreme swelling with his left eye completely swollen shut, he had a fractured nose and was in "a lot" of pain, and blood continued to stream down his face from an open wound (544; Peo. Exs. 1-3).  He was dizzy and had a debilitating headache that worsened during a one block ride in a patrol car.  Pucci's mental state was so compromised that he did not remember that he had already received on-site medical treatment before the showup.  In addition, prior to the showup, Pollard approached Pucci in the ambulance and "told him that he had to come over and ID

these guys" (Pollard: 637-38).   This was extremely suggestive, and, despite the language barrier, appeared to have been understood by Pucci, who knew that he had been escorted to the scene of the showup "to see if [he could] recognize the people that beat [him]" (Pucci: 506).   In short, this was not the type of "compelling eyewitness [identification] testimony" that would lead to a finding of harmlessness. Ruiz v. Kuhlmann, 80 Fed. Appx. 690, 693-94 (2d Cir. 2003).

Second, Rodriguez's statements were not cumulative because petitioner's own alleged oral statement included no admission of guilt, stating only that he tried to break up a fight involving Rodriguez on 97th Street.   That petitioner even made such a statement—which was not tape or video recorded, adopted in writing by petitioner, or memorialized by police for four days—was vigorously contested.   See Samuels v. Mann, 13 F.3d 522, 526–27 (2d Cir. 1993) (whether Bruton error is harmless requires "consider[ing] the nature and content of the defendant's own statement, in particular, whether it satisfactorily explains his or her part in the crime without reference to the codefendant's statement," and any attempts to repudiate his own statements) (quotation omitted); McBee, 644 F. Supp. 2d at 274-75, 284-85 (petitioner's own confessions were sufficient for conviction and rendered cumulative the statements admitted in violation of his confrontation right); People v. Hamlin, 71 N.Y.2d 50, 758-59 (1988) (evidence overwhelming where defendant's own "written confession was detailed, complete, and internally consistent[, and] was supported by objective evidence," including physical evidence).

Ultimately, the most persuasive evidence of petitioner's guilt was that which should never have been before the jury: Rodriguez's statements in which he essentially confirmed his involvement in an assault of the complainant, whom he punched; denied there was a robbery but was not certain about that; and expressly placed petitioner with him during the incident and said that they fled together.  In bolstering the reliability of Pucci's showup identification, Rodriguez's statements substantially strengthened the People's case and went right to the heart of petitioner's defense of mistaken identity.   See Eley, 712 F.3d at 861 ("damning testimony about [inadmissible] confession implicating [petitioner] 'added substantial, perhaps even critical, weight to the Commonwealth's case'") (quoting Bruton, 391 U.S. at 128).

Increasing the probability that the Rodriguez's statements affected the outcome here, the prosecutor emphasized their significance in summation (while distorting petitioner's). United States v. Becker, 502 F.3d 122, 135 (2d Cir. 2007) (admission of coconspirators' plea allocutions violated Crawford and was not harmless when, inter alia, the prosecutor's summation "repeatedly highlighted the significance of the allocutions"); Ryan, 303 F.3d at 254-55 (confrontation error not harmless when it was "lynchpin of" People's case and "not merely mentioned in passing").

Finally, the trial record confirms that Rodriguez's statements mattered to the jury, since it requested during its prolonged deliberations that Rodriguez's oral statement be read back with petitioner's (864-67, 875; Ct. Ex. 2).  The jury had also received Rodriguez's written statement with the rest of the exhibits requested during

deliberations (851-58; Ct. Ex. 1). Even *with* the un-confronted accusations against petitioner, the jury still struggled to reach a verdict for days. See Mason, 16 F.3d at 45 (Bruton error not harmless when jury requested the inadmissible evidence during deliberations, and struggled to reach verdict).

In sum, there is at least "grave doubt" as to whether the confrontation errors likely affected the verdict, and habeas relief is therefore warranted. See Adamson, 633 F.3d at 260 (quoting O'Neal v. McAninch, 513 U.S. 432, 438 (1995)).

## POINT II

DEFENSE COUNSEL'S FAILURE TO OBJECT TO THE USE AGAINST PETITIONER OF HIS NON-TESTIFYING CODEFENDANT'S CUSTODIAL STATEMENTS, OR TO THE PROSECUTOR'S SUGGESTION THAT AN UNCALLED WITNESS HAD ACCURATELY IDENTIFIED PETITIONER IN THIS ONE-WITNESS-IDENTIFICATION CASE, VIOLATED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

Although defense counsel was aware of Crawford, she repeatedly and inexplicably failed to secure petitioner's right of confrontation. She stood silent when the trial court proposed an inadequate redaction of Rodriguez's statements, did not ask for a limiting instruction to which petitioner was entitled, and made no protest whatsoever to the admission of Rodriguez's written statement. She also did nothing when the prosecutor suggested that an uncalled witness, Miguel Lopez, had accurately identified her client as one of the perpetrators. Because no legitimate strategy could

explain counsel's failures, and unchallenged evidence and arguments undoubtedly tainted the verdict, petitioner was deprived of his right to the effective assistance of counsel.   U.S. Const. Amends. VI, XIV; Strickland v. Washington, 466 U.S. 668 (1984).

Under the two-pronged test established in Strickland, to prevail on a federal claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's errors, the results of the proceeding would have been different.  466 U.S. at 687-88, 694.  On federal habeas review, the court must consider "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v. Richter, 562 U.S. 86, 105 (2011). Counsel's confrontation-related errors in this case were so egregious and inexplicable that her performance must be considered ineffective even under such deferential standards.

Counsel missed every opportunity to prevent the use of Rodriguez's incriminating statements against petitioner.  Although she objected before trial that admission of Rodriguez's confession would violate Crawford if he did not testify, she acquiesced in a plainly inadequate redaction of his oral statement that continued to refer to her client by name, and made no objection or attempt to redact the implicit accusations against him from Rodriguez's written statement.  Counsel never requested a jury instruction (or even argued during her own summation) that Rodriguez's

statements could not be used against petitioner, and she failed to object when the prosecutor exploited the evidentiary error by arguing that the jury *should* consider the statements together as proof of petitioner's guilt.  Even when the prosecutor indicated during the charge conference that the jury must consider the evidence separately as to each defendant, which should have flagged the issue, counsel *still* did not request a limiting instruction.  Nor did she object that the court's generalized charge failed to explain that Rodriguez's statements could not be considered at all in the case against petitioner.  Indeed, her inaction suggests that she believed—wrongly—that her efforts were more than sufficient to protect petitioner's rights.

Counsel's inept handling of the confrontation issue was further demonstrated by her failure to object as the prosecutor repeatedly implied that Lopez, an uncalled witness, had identified petitioner to the police at the scene.  Although counsel knew that Lopez's apparent identification was "testimonial evidence" (P. 10-11)—indeed, the prosecutor admitted that revealing what Lopez had actually said would be a confrontation violation—counsel did not object to the prosecutor's plan to elicit police testimony that would reveal the identification by inference when this was discussed before trial.  Instead, she sought only to reopen the suppression hearing to cross-examine the complainant about his showup identification.  Counsel also did not object to the prosecutor's opening statement previewing the inferential hearsay identification by telling the jury it would hear that petitioner and Rodriguez were arrested after the police spoke with Lopez, and she did not object when this was in

fact elicited from McMenamin.  Notably, this seemed to be the primary purpose of calling McMenamin to the stand since his testimony was otherwise cumulative of Pollard's.

*At a minimum*, counsel should have objected to the prosecutor's closing arguments on the subject.  During trial, the prosecutor elicited from both Pucci and Pucha that two men followed Pucci's attackers from the scene.  In summation, the prosecutor asked, "what do you make out of the testimony about the citizens that were on the street," and stated that neighbors pursued the assailants and the police subsequently "had a conversation with a citizen" on 103rd Street (804-05).  Although he conceded that it was "*not* in the record," the prosecutor nonetheless asked the jury to "infer[]" that "these (indicating) two defendants never left the eyes of those citizens," adding, "These (indicating) are the two involved in this incident" (804).  The obvious implication was that at least one of the pursuers identified Rodriguez and petitioner, presumably Lopez given the prosecutor's opening statement and McMenamin's testimony.  And yet counsel did not object or request a curative instruction to prevent the jury from speculating both that there was another identification by one or more witnesses who did not testify and that it must have been accurate.  Everything counsel did—or, more precisely, did not do—demonstrated that she did not understand the scope of petitioner's confrontation right or how to prevent its violation.

Counsel's errors demonstrated sheer "ignorance of the law" regarding confrontation, Kimmelman v. Morrison, 477 U.S. 365, 385 (1986), a constitutional right so fundamental that the Supreme Court has referred to it as a "bedrock procedural guarantee." Crawford, 541 U.S. at 42. An attorney "has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." Morrison, 477 U.S. at 384 (quotation omitted); see People v. Droz, 39 N.Y.2d 457 (1976) (defense counsel must have knowledge of law and facts). Indeed, "the core purpose" of affording the right to counsel was to ensure assistance with "the intricacies of the law and the advocacy of the public prosecutor." United States v. Cronic, 466 U.S. 648, 654 (1984) (quotation omitted). Petitioner's attorney failed utterly in this regard, which allowed the prosecutor to introduce voluminous damning evidence free from any confrontation by petitioner.

No legitimate strategy can explain this. See Strickland, 466 U.S. at 684 (defendant must show that error did not stem from what "might be considered sound trial strategy"). For example, counsel did not argue in summation that Rodriguez made no accusation of any wrongdoing by petitioner and that mere presence was insufficient to prove accomplice liability. Instead of trying to use the statements to exculpate petitioner, which would have been consistent with a strategy for not objecting to them, counsel made no reference to them at all, attempting only to minimize appellant's own statement and questioning whether it was actually made. Compare Mason, 16 F.3d at 44 ("there can be no suggestion that" counsel's failures to

object to detective's suggestion that non-testifying codefendant inculpated defendant, or to prosecutor reiterating this point in summation, "were tactical"); with Chrysler v. Guiney, 806 F.3d 104, 122-23 (2d Cir. 2015) (counsel's acquiescence in admission of non-testifying codefendant's grand jury statements at joint trial appeared strategic, given counsel's closing arguments that codefendant's girlfriend's testimony about those statements exculpated defendant); People v. Reid, 71 A.D.3d 699, 700 (2d Dep't 2010) (counsel not ineffective for failing to object codefendant's statement on Bruton and Crawford grounds because counsel's "affirmative use of the statement may well have been in furtherance of [reasonable] trial strategy").  And nothing can explain why an attorney would not object to inadmissible identification evidence when the defense theory was mistaken identity.

In short, counsel's mishandling of Rodriguez's statements was patently unreasonable.  Strickland, 466 U.S. at 684, 687; Henry v. Scully, 78 F.3d 51 (2d Cir. 1996), affirming 918 F. Supp. 693 (S.D.N.Y. 1995) (counsel ineffective for, inter alia, failing to object at joint trial to admission, against defendant, of nontestifying codefendant's confession); Mason, 16 F.3d at 44 (counsel ineffective for failing to object to testimony that defendant was arrested after detective spoke with non-testifying accomplice, or to prosecutor's closing argument about the implication that accomplice had inculpated defendant, and failing to object to including that portion of detective's testimony in readback requested by jury).  As was counsel's "incomprehensible" failure to object to the prosecutor's argument that Lopez, an

uncalled witness, had reliably inculpated petitioner. See Henry, 78 F.3d at 53, affirming 918 F. Supp. at 693 (not objecting to damaging hearsay from uncalled informant contributed to ineffectiveness).

Because counsel's errors resulted in the admission of the worst evidence against petitioner —in an otherwise very weak one eyewitness identification case (see ante, (I) [pp. 30-33])—there is a "reasonable probability" that, but for his attorney's deficient performance, the outcome of petitioner's trial would have been different. Strickland, 466 U.S. at 695. The "reasonable probability" standard does not require a defendant to show that it was *likely* that counsel's errors affected the verdict, but only "a probability sufficient to undermine confidence" that it was just. Henry v. Poole, 409 F.3d 48, 64 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 694). The "totality of the evidence" must be considered, and "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id. (quoting Strickland, 466 U.S. at 695-96); see Henry, 918 F. Supp. at 717-18 (Strickland's prejudice prong requires assessing "significance of [evidence] improperly admitted" due to counsel's errors).

Here, as in Mason, 16 F.3d at 45, where the Second Circuit found Strickland's prejudice prong satisfied, there was no physical evidence whatsoever connecting petitioner (or his codefendant) to the crime and the identification evidence was "certainly not overpowering." Nor did petitioner's statement or other admissible evidence overcome the weakness of the People's case without Rodriguez's statements.

Amaker v. Lacy, 941 F. Supp. 1340, 1347-52 (E.D.N.Y. 1996), aff'd, 133 F.3d 906 (2d Cir. 1997) (counsel's failure to object to summation remarks that violated Bruton did not cause prejudice because defendant's own testimony doomed his misidentification defense); see also Frankos v. Sendowski, 937 F. Supp. 227, 233-35 (S.D.N.Y. 1996), aff'd, 116 F.3d 465 (2d Cir. 1997) ("the *Bruton* error and trial counsel's failure to object was harmless" in light of "substantial other evidence" of defendant's guilt).

Moreover, the errors that counsel ignored both strengthened the People's case and hurt the defense. See Mason, 16 F.3d at 44-45 (improper implication that non-testifying codefendant had led police to defendant strengthened identification case, making counsel's failure to object prejudicial); cf. Solomon v. Harris, 749 F.2d 1, 2-3 (2d Cir. 1984) ("Counsel's failure to raise the *Bruton* objection did not undermine the identification prong of the defense strategy"). The prosecutor's reliance in summation on Rodriguez's statements also supports a finding of prejudice. See Mason, 16 F.3d at 45 (prejudice prong met when, inter alia, summation revealed that prosecutor "plainly felt" that implied accusation by non-testifying codefendant was "critical" to People's case); Henry, 918 F. Supp. at 718 (prosecutor emphasized the significance of the improperly admitted evidence).

Even if this were not enough, the added harm of not objecting to the additional confrontation error in summation tipped the scales. See Henry, 918 F. Supp. at 718 (verdict not trustworthy due to counsel's failure to object to admission of non-testifying codefendant's confession, "especially when . . . considered in combination

41

with the admission of [other] improper hearsay" attributed to uncalled informant). Notably, the People apparently felt that the inferential identification by Lopez was extremely important.  They called McMenamin to discuss it, tried to call another detective to describe efforts to locate Lopez, and deliberately strayed from the record in summation to reinforce and bolster the identification.

In short, counsel evinced a complete lack of understanding of a fundamental constitutional right, and this resulted in the use of inadmissible and incriminating evidence in an otherwise weak case.  Thus, there is no "reasonable argument," Harrington, 562 U.S. at 105, that her performance complied with Strickland's standards, and this court should grant petitioner's petition.

## PETITIONER'S ENTITLEMENT TO A WRIT OF HABEAS CORPUS

This Court has the power to issue a writ of habeas corpus on petitioner's confrontation claim because the Appellate Division's decision affirming his conviction and sentence resulted in a decision that was "contrary to" and "involved an unreasonable application" of "clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Williams v. Taylor, 529 U.S. 362, 412-13 (2000); see Cotto v. Herbert, 331 F.3d 217 (2d Cir. 2003).

A.    Exhaustion

1.    Confrontation Claim (Point I)

The Appellate Division found that petitioner failed to preserve his confrontation claim (Point I, ante), and such a procedural default generally constitutes "an adequate and independent ground" for a state court's rejection of a federal claim. See Coleman v. Thompson, 501 U.S. 722, 729-30, 749-50 (1991). But this Court may reach the merits in this case because counsel's failure to object amounted to ineffective assistance that was "cause for the default," and "actual prejudice" resulted. See Coleman, 501 U.S. at 754; Murray v. Carrier, 477 U.S. 478, 488 (1986).

The Supreme Court has unequivocally held that ineffective assistance of counsel can constitute an external impediment imputed to the State that satisfies the "cause" requirement for overlooking procedural default on habeas corpus review. Coleman, 501 U.S. at 754; Carrier, 477 U.S. at 488. The Second Circuit has left open "whether de novo review or AEDPA deference applies when a habeas petitioner advances a claim of ineffective assistance as cause to excuse procedural default." Tavarez v. Larkin, 814 F.3d 644, 650, n. 3 (2d Cir. 2016) (acknowledging circuit split on this issue). Here, counsel was ineffective no matter what standard applies.

Counsel's failure to object to the evidence and summation arguments at issue in Point I deprived petitioner of effective assistance, since the introduction thereof clearly violated petitioner's confrontation rights under then-existing law with which counsel should have been familiar. As discussed in detail (see Point II, ante), counsel recognized that introducing Rodriguez's custodial statements would violate Crawford if he did not testify but consented to an inadequate redaction of his oral statement and

43

made no objection to his written statement at all.  Counsel then failed to request the required limiting instruction at any of the multiple opportunities she had to do so: when the prosecutor mentioned Rodriguez's statements in his opening statement; when they were admitted into evidence through Fischer; when the prosecutor reminded the court during the charge conference that the evidence against each defendant had to be considered separately by the jury; when the court gave its jury charge; and when the jury requested the statements during deliberations.  Counsel also failed to object when the prosecutor, in summation, took advantage of the Crawford error by arguing that the jury should use Rodriguez's statements against petitioner and admittedly strayed from the record to speculate that Lopez's unconfronted inferential identification of petitioner was reliable.

The inadmissible evidence and improper summation arguments significantly strengthened a weak identification case while undercutting petitioner's mistaken identity defense.  Indeed, the jury deliberated for days before ultimately convicting him.  It is extremely unlikely the jury would have reached the same result absent Rodriguez's statements and the prosecutor's improper closing arguments.  Accordingly, counsel's failure to object to this evidence or request any limiting or curative instructions constituted ineffective assistance of counsel under Strickland, 466 U.S. 668, and Harrington, 562 U.S. 86.

Although the "prejudice" requirement for avoiding procedural default has not been carefully defined, see Amadeo v. Zant, 486 U.S. 214, 221 (1998), petitioner has

met that standard under any reasonable formulation of it.  First, he has shown more than the mere possibility of prejudice, see United States v. Frady, 456 U.S. 152, 170 (1982)—he has shown both "actual and substantial disadvantage," id., and that counsel's failure to object "undermine[d] confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995).  Second, since he has met the prejudice prong of the Strickland test, he has necessarily shown sufficient prejudice for purposes of avoiding dismissal of this claim due to procedural default.  Jackson v. Leonardo, 162 F.3d 81, 86 (2d Cir. 1998).

### 2.    Ineffective Assistance of Counsel Claim (Point II)

Petitioner's ineffective assistance of counsel claim (Point II, ante) was fully exhausted in state court.  Petitioner argued in the Appellate Division that defense counsel was ineffective for failing to object to the admission of Rodriguez's statements, failing to request a limiting instruction, and failing to object to the prosecutor's closing arguments regarding Rodriguez's statements and the inferential hearsay identification—the same errors presented in this petition (see Ex. B at 42-44; Ex. D at 2-4, 7-8).  The Appellate Division ruled against petitioner on the merits of the confrontation and related prosecutorial misconduct claims, and necessarily rejected his argument that counsel was ineffective for failing to raise these claims at trial.  The Court of Appeals denied petitioner's leave application in which he again argued that counsel was ineffective for the same multitude of errors relating to

Rodriguez's statements and incorporated all other claims presented in his Appellate Division briefs (see Ex. F).   Because the Appellate Division rejected petitioner's substantive claims, he was procedurally barred from seeking post-conviction review of his ineffective assistance of counsel claims.   N.Y. Crim. Proc. Law § 440.10(2)(a) (McKinney) (2016).   Accordingly, the ineffective assistance claim was exhausted both for the purpose of considering it as a standalone claim and as "cause for the default" regarding the confrontation claim.[5]

B.   Timeliness

Since petitioner's original petition was filed within 1 year and 90 days of the date his state appeal became final when leave to appeal to the Court of Appeals was denied on June 30, 2015, it was timely (see Exhibit F).   Jiminez v. Quarterman, 555 U.S. 113 (2009); Ross v. Artuz, 150 F.3d 97, 98 (2d Cir. 1998).

C.   AEDPA Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to habeas review of "any claim that was adjudicated on the merits in State court proceedings," and relief may not be granted unless that adjudication

> resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

---

[5]  "'[A] claim of ineffective assistance' . . . generally must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'"   Edwards v. Carpenter, 529 U.S. 446, 452 (2000) (emphasis added) (quoting Murray, 477 U.S. at 489).

28 U.S.C. § 2254(d)(1).

"A state-court decision is 'contrary' to established federal law within the meaning of § 2254(d)(1) if it is 'diametrically different' from, 'opposite in character or nature' to, or 'mutually opposed' to the relevant Supreme Court precedent." Henry, 409 F.3d at 68 (quoting Williams, 529 U.S. at 405).  To be "contrary to" clearly established federal law, a state court's conclusion of law must be opposite to a conclusion reached by the Supreme Court or resolved differently on a materially indistinguishable set of facts.  Williams, 529 U.S. at 413.

A state court makes an unreasonable application of federal law when it "'correctly identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case,' or refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." Hoi Man Yung v. Walker, 468 F.3d 169, 176 (2d Cir. 2006) (quoting Williams, 529 U.S. at 413).  The issue is not whether all reasonable jurists would agree that there was error, but rather that there was "'some increment of incorrectness beyond'" mere error, Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005) (quoting Williams, 529 U.S. at 411), which "need not be great." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000); see Jimenez, 458 F.3d at 147.

The Appellate Division's ruling on the confrontation violations was both contrary to and an unreasonable application of federal law.  Its rejection of the ineffective assistance of counsel claim was an unreasonable application of Strickland.

1.    Confrontation Claim (Point I)

The Appellate Division's conclusion that the admission of Rodriguez's custodial statements against petitioner did not violate Crawford, 541 U.S. 36, or Bruton, 391 U.S. 123, see Gilocompo, 125 A.D.3d at 1001, was contrary to clearly established federal law.  Long before petitioner's trial, the Supreme Court held that testimonial hearsay is inadmissible against a defendant who has not had an opportunity to cross-examine the declarant, and the Court expressly included custodial statements in its definition of testimonial hearsay.  Crawford, 541 U.S. at 51-53, 68-69.  Even before Crawford, the Supreme Court made clear that a limiting instruction is required when a non-testifying codefendant's statement is introduced at a joint trial.  See Richardson, 481 U.S. at 203-04, 206, 211, 220 n. 3; Bruton, 391 U.S. at 123-29; Henry, 918 F. Supp. at 714.

Although the Appellate Division cited Crawford as it rejected petitioner's confrontation claim, its reasoning reflects that it applied Bruton instead.  Addressing Rodriguez's statements, the Appellate Division concluded that there was no confrontation violation because "each one, taken individually, did not directly implicate [petitioner]."  Gilocompo, 125 A.D.3d at 1001.  In support of this conclusion, the Appellate Division relied upon People v. Melendez, 285 A.D.2d 819, 821-22 (3d Dep't 2001), a pre-Crawford case that applied the Bruton rule.  But because the court never told the jury it could not consider Rodriguez's statements against petitioner, Bruton was inapposite.  See Lee v. Illinois, 476 U.S. 530, 542 (1986)

(Bruton was "concerned with the effectiveness of limiting instructions in preventing spill-over prejudice to a defendant when his codefendant's confession is admitted against the codefendant at a joint trial"). Thus, the Appellate Division's mistaken reliance on Bruton, and refusal to apply Crawford, was at odds with governing Supreme Court precedent. See Daly v. Burt, 613 F. Supp. 2d 916, 924-25 (E.D. Mich. 2009) ("introduction of the [non-testifying] codefendants' statements at trial, as proof of Petitioner's guilt" was "contrary to, and an unreasonable application of" Crawford); cf. Adamson, 633 F.3d at 256-59 (state court's failure to recognize necessity of limiting instruction with non-testifying accomplice's statement—even when admitted for purpose other than its truth—was contrary to clearly established Supreme Court law).

Moreover, a facially incriminating statement—one that fails to remove references to the defendant—is not admissible at all, even with a limiting instruction and even when the link to the defendant is implicit. E.g., Gray, 523 U.S. at 185-86, 194-96 (Bruton, not Richardson, applies when statement refers to accomplice and jury can easily infer that defendant is the one mentioned). Rodriguez's statements referred to petitioner by name, providing yet another reason that the Appellate Division's decision was contrary to the way the Supreme Court has defined and applied the Bruton rule.

The Appellate Division's ruling about Rodriguez's statements was also an "unreasonable application" of clearly established federal law. The statements came

from a single interrogation, with the written statement made in response to Fischer asking Rodriguez to memorialize what he had just told Fischer orally.   Fischer explained this when the statements were admitted, and the prosecutor lumped the statements together, along with petitioner's, in summation.   And yet the Appellate Division inexplicably refused to consider Rodriguez's statements as a whole in determining whether there was a <u>Bruton</u> violation.   Instead, the Appellate Division parsed them and held that neither was facially incriminating on its own.   Although the Appellate Division cited <u>Melendez</u> in support of this rationale, <u>Gilocompo</u>, 125 A.D.3d at 1001, <u>Melendez</u> was completely different because the statements at issue were made by various people during several different conversations.   285 A.D.2d at 821-22.   In petitioner's case, not only was the Appellate Division's strained approach illogical, but it unfairly ignored the danger of the jury using each defendant's statement against the other when the Supreme Court has explained that accomplice statements which minimize guilt and shift blame, like the ones at issue here, are inherently unreliable.   <u>See</u> <u>Lee</u>, 476 U.S. at 541.

   In any event, it was unreasonable to conclude that neither of Rodriguez's statements was incriminating on its own.   The written statement in particular obviously referred to the charged crime and indicated that Rodriguez had an accomplice with whom he fled.   <u>Cf.</u> <u>Fuentes</u> v. <u>T. Griffin</u>, — F.3d —, 2016 WL 3854206, *13-15 (2d Cir. 2016) (New York Court of Appeals unreasonably applied federal law by ignoring key facts from psychiatric report that could have been relevant

to the jury, in holding that report's nondisclosure pursuant to <u>Brady</u> was immaterial). The fact that there were only two participants in the crime and only two men on trial made it obvious that petitioner was that accomplice, as the Supreme Court has explained.   <u>E.g.</u>, <u>Gray</u>; 523 U.S. at 193; <u>Eley</u>, 712 F.3d at 858-61 (state court "unreasonably applied . . . <u>Bruton</u> and its progeny" by denying severance when it knew that non-testifying codefendant's confession referred to two accomplices and only three defendants were on trial).

## 2.   <u>Ineffective Assistance of Counsel Claim (Point II)</u>

The New York courts unreasonably applied <u>Strickland</u> by rejecting petitioner's ineffective assistance of counsel claim.   <u>See</u> <u>Davis</u> v. <u>Greiner</u>, 428 F.3d 81, 87 (2d Cir. 2005) (<u>Strickland</u> is the relevant clearly established federal law regarding ineffective assistance for AEDPA purposes; petitioner need not show that the underlying theory was also clearly established).   Because the state courts summarily rejected this claim, the reasonableness of their rulings depends only upon the "ultimate" decision that counsel was not ineffective, "rather than on the state courts' reasoning."   <u>Davis</u>, 428 F.3d at 88.   Counsel's performance was obviously deficient here, the resulting prejudice was extreme, and federal courts have previously held that the types of errors committed by petitioner's attorney constitute ineffective assistance.

As explained in Point II, <u>ante</u>, counsel was ineffective for failing to object to the admission of Rodriguez's statements and the prosecutor's closing arguments

about them, as well as the prosecutor's arguments about Lopez's inferential hearsay identification.  Even though counsel was aware that Rodriguez's statements posed a <u>Crawford</u> problem should they be introduced without an opportunity to cross-examine him, she failed to object when the redacted version of his oral statement continued to incriminate her client, failed to object to the written statement at all, and failed to ever request limiting instructions.   At the very least, she should have recognized the need for a limiting instruction that the statements were not admissible against petitioner, since this rule is clear from <u>Crawford</u> itself, 541 U.S. at 52, 56-58, 68, and has been discussed repeatedly by the Supreme Court since <u>Bruton</u> was decided in 1968.  <u>See</u>, <u>e.g.</u>, <u>Gray</u>, 523 U.S. 185; <u>Richardson</u>, 481 U.S. 200; <u>Cruz</u>, 481 U.S. 186; <u>Lee</u>, 476 U.S. 530.

This was not a minor oversight by counsel given the numerous chances she had to object or request the appropriate limiting instruction: the pre-trial colloquy about the admissibility of the statements; the prosecutor's opening statement declaring that both defendants had admitted fighting with the complainant; the admission of the statements through Fischer; the charge conference; the prosecutor's summation urging the jury to use Rodriguez's statements against petitioner; the final charge instructing the jury that it could consider the defendants' statements so long as they were deemed voluntary; and the jury's request for the statements during deliberations. Nor can counsel's silence reflect a strategic decision that Rodriguez's statements were helpful to petitioner, since she never made any such argument.  And, as illustrated in

Point I, ante, counsel's errors clearly prejudiced petitioner because Rodriguez's statements were the worst evidence against him in a weak case where the only identifying witness made no in-court identification, his pre-trial identification was unreliable, there was no physical evidence, and petitioner denied his guilt. Accordingly, it would be unreasonable to conclude that counsel's performance satisfied Strickland. See Henry, 78 F.3d 51 (affirming grant of habeas relief when counsel failed to object to non-testifying codefendant's confession).

Moreover, that counsel did not understand petitioner's confrontation rights was apparent from her failure to recognize that Lopez's inferential hearsay identification was also inadmissible. As with Rodriguez's statements, counsel had many opportunities to object to the testimony about Lopez: a pre-trial discussion of his unavailability; the prosecutor's opening statement referring to him by name and his role in the petitioner's apprehension; McMenamin's testimony about him; and the prosecutor's blatantly improper closing argument that the jury should infer that Lopez had accurately identified petitioner because he never lost sight of him from the scene of the crime. It is clearly established that a prosecutor may not elicit testimony that implies an uncalled witness inculpated the defendant to a police officer, nor establish that improper inference during closing arguments. Indeed, the Second Circuit has previously granted habeas relief on the basis that New York state courts unreasonably rejected a confrontation claim where the prosecutor had elicited that a detective read the defendant his Miranda warnings after speaking with a different detective who was

interrogating an accomplice, and the prosecutor highlighted this fact in summation. Ryan, 303 F.3d at 240-44; see also Mason, 16 F.3d at 40-41 (pre-AEDPA; habeas relief granted where detective testified that defendant was arrested after conversation with non-testifying accomplice and prosecutor discussed this in summation).

## RELIEF REQUESTED

Petitioner requests that this Court:

(1) Issue a writ of habeas corpus, and

(2) Order respondent to discharge petitioner from his unconstitutional confinement unless, within a reasonable time, petitioner is afforded a new trial, and

(3) Grant petitioner such other and further relief as may be just and proper.

Respectfully submitted,

Lynn W. L. Fahey (LF 1652)
Attorney for Petitioner

_____
By: Paul Skip Laisure (PL 5560)
Appellate Advocates
111 John Street – 9th Floor
New York, New York 10038

September 6, 2016