UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
LAZARO GILOCOMPO,

                    Petitioner,                              **MEMORANDUM & ORDER**

            -against-                                         16 CV 4963 (RJD)

DARWIN LACLAIR, Superintendent,

                    Respondent.
-----------------------------------------------------x
DEARIE, District Judge.

Before the Court is the application of petitioner Lazaro Gilocompo for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Petitioner was convicted in 2012 after a jury trial in Queens Supreme Court of second-degree robbery (two counts) and second-degree assault (one count) and acquitted of the top count of first-degree robbery. He was sentenced to concurrent terms of seven years on each robbery count and six years for the assault, plus concurrent terms of five years' post-release supervision. The charges arose out of petitioner's participation with codefendant Rodolfo Rodriguez in the attack and robbery of Manuel Pucci on a Queens street on October 16, 2010. At the joint trial, the victim's account was corroborated by an eyewitness, and further evidence established that, as the assailants fled in a taxi, they were chased by neighbors, pointed out to police, apprehended together moments later a block from the scene, and promptly identified by the victim.

Neither defendant testified but the court admitted certain statements each made to police. In petitioner's statement, he admitted he was at the scene, involved in the fracas and fled in a taxi but claimed he was only trying to break up a fight. Rodriguez's oral statement was redacted to exclude the portion accusing petitioner of instigating the crime; in his unredacted written

statement, he admitted that he punched the victim, denied robbing him, and said "we" then got in a cab.

Petitioner's sole ground for habeas relief is his claim that Rodriguez's statements implicate him and that their admission without a limiting instruction violated his rights under the Confrontation Clause. He concedes that this claim was not preserved at trial and is procedurally barred here and so also raises an ineffective assistance of counsel claim as the cause and prejudice that, if established, would lift the procedural bar.

For the reasons discussed, the application is denied and the petition dismissed.

## FACTUAL BACKGROUND

### I.  The Trial

#### A.  The Attack on Pucci

Pucci testified that at approximately 9:00 a.m. on October 15, 2010, while walking on 98th Street near 38th Avenue in Queens, he was "held up" by two men he had never seen before. (468, 515).[1]  He was carrying $600 in cash, a cellphone, and a wallet. Five of the six hundred dollars, a rent payment he intended to make later in the day to his brother, was in an envelope in his right pants pocket, while the remaining cash, which he intended to give a coworker that day in repayment of a loan, was in his left pants pocket. (465-68). His cellphone was attached to his belt (482); the wallet's location was not specified.

Pucci first noticed the two men when they were about ten feet away, coming toward him from the other side of the street. (471-73, 528-29). He testified that one of his attackers was 6 to

---

[1] References are to pages in the trial transcript.

8 inches taller than the other and wearing a black jacket (531); it was the taller one who "came across behind" him and "put his arm around [his neck]," said 'don't scream, give me the money'" and reached into Pucci's pockets, while the shorter assailant, wearing a black hoodie, began to beat him, first with fists and then with a brick.  Pucci was struck around his nose, eye, temple, and forehead, and bled extensively.  (474-76, 531-32).[2]  Swelling caused his left eye to close but he could see out of his right eye.  (505-510, 536-37).[3]  Pucci fell and "blacked out" for approximately two minutes; he also stated that he did not know what it meant to "lose consciousness."  (495, 537-39, 551).

The attack ended when a neighbor, whose name Pucci did not know, shouted at the attackers.  As this neighbor came to Pucci's aid, Pucci saw two other neighbors emerge from their homes and heard the neighbor who was helping him shout to the others to "follow those two," indicating the fleeing assailants.  (487, 495).  None of these three neighbors was a witness at trial. Pucci, however, was pressed on his capacity to observe and confirmed that he saw his attackers flee and saw the neighbors chasing them. (495, 540).

A fourth neighbor, who observed the events from inside her home on 98th Street, offered testimony generally corroborative of Pucci's account.  Janeth Pucha testified that at approximately 9:20 on the morning of October 16, 2010 she heard a man screaming for help, went to her window, and saw two men beating at third man on the sidewalk in front of her house.

---

[2] In their arrest photos, petitioner was wearing a black jacket and Rodriguez a black hoodie. Petitioner was indeed taller than Rodriguez but only by one inch. (603).

[3] A photo taken of Pucci at the hospital several hours later, which depicted his injured state, along with his medical records, were also admitted. (511).

3

(707).  She telephoned the police to report the incident, but was not contacted by law

enforcement until "some months" later.  (719).  Pucha stated that one of the assailants grabbed

the victim by the neck and shoved him against a tree, that the other punched the victim and hit

him with "something like a rock," and that both reached into the victim's pants pockets. (707-

711).  She described the assailants as Latin, said one was wearing a hoodie, and saw two

neighbors chasing them as they fled.  (703, 705-09, 711-13, 716).

### B.  The Arrest and Identification of Petitioner and Rodriguez

Officer Shonda Pollard testified that she and her partner responded to a radio call

reporting the incident and learned that Pucci had been robbed of his wallet and $600 cash and

that the assailants were Hispanic.[4]  Sergeant Brian McMenamin and his partner Officer Anthony

Alvarez responded to the same radio call, saw Pollard attending to Pucci, and within minutes left

to respond to a subsequent radio transmission involving an incident at a Dunkin' Donuts a few

blocks away.

The trial court then asked McMenamin, "At the time that you hear this second radio run,

do you know whether or not [ ] it had anything to do with the first radio run."  McMenamin

replied, "Yes, it was in relation to the robbery call we were on." (566).  As McMenamin

continued, "It stated that—," the Court interrupted him by saying "okay."  Rodriguez's counsel

then objected, and the Court stated, "People, next question." (566).

As McMenamin and Alvarez arrived at the Dunkin Donuts they were approached by an

individual named Miguel Lopez (567, 569).  Lopez had an "animated conversation" in Spanish

---

[4] Pollard communicated through the neighbor assisting Pucci, who translated her English into
Spanish.  This neighbor was not interviewed and not a trial witness.

with Alvarez and "kept gesturing" to an approaching taxi, approximately 1-2 car lengths away. (567-68).[5] McMenamin returned with Alvarez to their vehicle and, maintaining a steady view of the taxi, followed as it turned and headed away. (567-70).

Meanwhile, Pollard left Pucci with his neighbor and also responded to the Dunkin' Donuts radio call. On the way, she encountered McMenamin, who directed her to assist in pursuit of the taxi and within a moment, they stopped it, only a block from the scene of the Pucci attack. Petitioner and Rodriguez were in the taxi's rear seat; they were removed, handcuffed, and placed against the cab in preparation for a show-up identification. The cash and items stolen from Pucci were not recovered. No blood was visible on either petitioner's or Rodriguez's clothing (confirmed later by their post-arrest photos).

### C.    The Show-Up Identification and Arrest

Pollard then walked the one block back to Pucci and advised him that "he [was] going to have to come over and identify the people who did this to him." (596). At the show-up, Pollard asked Pucci, "are these the guys;" she spoke in English because there was no translator available and "because it seem[ed] like he understand[s] a little bit of English." (598-99). Pollard testified that she "did not recall if [Pucci] responded in English or not, but [she] knew [she] had a positive ID from that point." (638).

Pucci himself also gave an account of the show-up after he was unable to make a positive

---

[5] Neither Lopez nor Alvarez testified. The prosecution reported that Alvarez was out of the country and "represent[ed]" to the court that Lopez was an "eyewitness," "one of the good Samaritans that chased after" petitioner and Rodriguez, and "never lost sight of them and then identified the taxi to Police Officer Alvarez." (734, 35). At the close of a pre-trial suppression hearing, the court ruled that "Lopez pointing to the individuals is not suppressible as being a product of suggestive police-arranged identification." August 25, 2011 Hearing Transcript at 63. Petitioner did not appeal that finding.

trial identification of his assailants.  (474-75).  To comply with the foundation required for testimony about a prior identification,[6] the prosecution elicited from Pucci that he "do[es]n't remember" the faces of his attackers because "[t]oo much time has gone by." (504).  Pucci was then permitted to testify that within fifteen minutes of the attack, he was taken to a nearby location—only a minute away—where he identified the two men who attacked him. (505-508).  Seated in a police vehicle approximately ten feet from his attacker, Pucci immediately saw "they were there…[t]he ones that had beaten me," recognizing them by "their faces and their clothing." (506-507).  At the time Pucci was still in pain, a little dizzy, bleeding, and had a headache.[7]

Pollard then returned to the scene of the attack and searched for but did not recover the stolen items or the brick used to strike Pucci.  She discovered blood on a tree, but did not have the sample tested and did not document this search in her notes.

### D.    Petitioner's Statement

Petitioner and Rodriguez each made statements to Detective Michael Fischer during separate Mirandized interviews conducted in English (both Miranda waiver forms were admitted).  Fischer said he had no reason to believe that either man did not understand English

---

[6] N.Y. C.P.L. § 60.25 authorizes "identification by means of previous recognition" when, in relevant part, a witness testifies that "[h]e observed the person claimed by the people to be the defendant . . . at the time and place of the commission of the offense" and "[h]e is unable at the proceeding to state, on the basis of present recollection, whether or not the defendant is the person in question."

[7] At a pre-trial suppression hearing, the court ruled that the show-up was "justified," and "[t]he fact that the defendants were in handcuffs . . . is not determinative of suggestiveness."  Aug. 25, 2011 Hearing Tr. at 63.  The court further ruled that "[t]he fact that a witness was told that  . . . some people had been stopped" was "not significant as to the issue."  Id.  The ruling was not challenged on appeal.

6

and he regarded their answers as responsive to his questions.[8]

Detective Fisher testified that petitioner made the following oral statements:

Q.      Tell us about your conversation with [petitioner]?

A.      I asked what happened?  And he responded, he was in the area of 97th Street with the codefendant, Rodriguez and he went to---[h]e stated that he fled on foot and got into a cab in the vicinity of 103rd Street.

Q.      Did he tell you what transpired while he was with the codefendant?
. . .

A.      There was some type of altercation with the codefendant Rodriguez.
…

Q.      Now, detective, in speaking to defendant Gilocompo, you just used the word altercation.  In fact, Gilocompo told you that there was a fight, correct?

A      That's correct.

Q.      And he stated to you that codefendant Rodriguez was in a fight at the vicinity of 97th Street?

A.      In the area of 97th Street, yes.

Q.      And he also told you that he, meaning Gilocompo, he was trying to break up the fight?

A.      Yes.

Q.      And then he stated to you that after he was trying to break up that fight, he fled on foot?

A.      Yes.

Q.      And, finally, you had a conversation that after he fled on foot that he got into a taxi in the vicinity of 103rd Street?

A.      Yes.  (Tr. 680-82).

---

[8] At a pre-trial suppression hearing, the court ruled that the statements were admissible, "find[ing] that [the statements] were given after the defendants had been appropriately warned of their rights and had agreed to make statements."  Aug. 25, 2011 Hearing Tr. at 63.  This ruling was not challenged on appeal.

Petitioner told Fischer that he did not know how to write and so declined to memorialize his statement.  (683).  The interrogation was not witnessed or recorded.  Fischer did not write down what petitioner said on the day of the interview but memorialized its "sum and substance" in the report he prepared four days later.  (699-700).  Before the interview, Fischer had already learned from Pollard that $600 had been stolen, that a "hard object" was used, and that a taxi was involved.  (686-687).

### E.    Codefendant Rodriguez's Oral and Written Statements

1.    The Pre-trial Admissibility Colloquy and Ruling

Before opening statements, petitioner's attorney moved to preclude the introduction of Rodriguez's post-arrest oral statement, arguing that its admission violated Crawford v. Washington, 541 U.S. 36 (2004).  According to the prosecution,

> Mr. Rodriguez in his oral statement stated that he was in the vicinity of 101st Street… by 37th Avenue when [petitioner] ran up to the guy and grabbed him as if he was going to rob him. "The incident got out of control when the guy resisted, that's when I tried to help [petitioner] and I punched the guy one time.  I heard a bunch of people yelling, so I ran on foot and got into a cab." (441).

The prosecutor stated that he would restrict the detective's testimony to Rodriguez's conduct; specifically, he would elicit "the fact that [Rodriguez] was in the vicinity," that "he stated that he was with [petitioner] and that he, during an incident, punched the complainant," and "then he heard people yelling, and he fled, and he got into a cab."  (441-42).  The Court clarified, "[h]e fled or they fled?" and the prosecution replied, "He said 'he.'" (442).

Counsel for Rodriguez—not petitioner's lawyer—then addressed the court, arguing that Rodriguez did not say "that he was with [petitioner]" and objected to the detective "saying anything of that nature."  (442).  In response, the prosecutor stated that he "had a little bit of a

8

concern using the word 'help' because that also goes into acting in concert" and instead "was going to solicit that they were together." (443). Following an off-the-record discussion, the court ruled as follows:

> It seems to me, then that in the efforts made by the People to elicit from the officers the substance of the oral statements given to the officer by Rodriguez [sic] can state that portion where Rodriguez said that he was present at a certain vicinity at a certain time and place, that there was a man there, that [petitioner] was there, that he Rodriguez punched the guy, and then they ran and got into a cab. (444).[9]

Petitioner's counsel, in response, stated "correct" and counsel for Rodriguez said "yes" when the Court asked, "clear?" (444).

Rodriguez also made a *written* statement that was briefly referenced in the colloquy but, through apparent oversight, its contents was not made clear to the court and it was not the subject of argument or a motion. At the close of the off-the-record colloquy, and just before announcing its ruling on Rodriguez's oral statement, the court remarked that, "counsel having given me a sense as to what happened," the court now understood that "there were two oral statements" – one by each defendant—and "one written statement." (443). The court, in a clarifying inquiry, asked, "One of the defendants, Rodriguez, made a written statement, correct?" and the prosecutor replied, "Yes." The court next asked, "What did Gilocompo" [*i.e.*, petitioner, not Rodriguez] "say in his written statement?" and in response, the prosecutor summarized *petitioner's oral* statement, *not Rodriguez's written statement*: "Mr. Gilocompo stated that he was in the area of 97th Street when Rodriguez got into a fight and I tried to break it up. I,

---

[9] Because the court had only moments earlier clarified that Rodriguez said that "he" rather than "they" got into a cab, the court presumably misspoke in its ruling authorizing the state to elicit that Rodriguez said that "they ran and got into a cab." Ultimately, Fischer testified that Rodriguez said that "he" got in a cab.

meaning him.  I ran on foot and got into a ca[b] in the vicinity of 103rd Street." (443).

There was no objection or clarification by petitioner's counsel.  As a result, neither the content nor the admissibility of Rodriguez's written statement was discussed.

2.     <u>Detective Fisher's Testimony as to Rodriguez's Oral and Written Statements</u>

Detective Fisher testified that Rodriguez made the following oral statements:

Q.     And what did defendant Rodriguez, tell you as to the location of this incident?

A.     It was in the area of 100th and 101st Street and 37th Avenue.

Q.     Did you have a conversation with respect to who he was with at that time?

A.     Yes.

Q.     What did he tell you?

A.     It's the codefendant, Gilocompo.

Q.     Did he call him by his first name?

A.     I don't recall the exact name used, but he referred to him, yes.

Q.     Did he tell you what happened during this incident?

A.     Yes.

Q.     What exactly did he tell you that he did?

A.     He was with the codefendant, Gilocompo, in the vicinity of 101st Street.

Q.     What is it that he did tell you that he did at that time?

A.     He said he did punch another person and he heard a crowd yelling.  He ran and got into a cab.  (663-64).

Fisher's testimony that Rodriguez was "with" petitioner in the vicinity of 101st Street exceeded the court's admissibility ruling and there was no defense objection.

As with the making of petitioner's statement, Rodriguez's statement was not recorded or

10

witnessed.  Rodriguez, however, memorialized his statement in a written document that

Detective Fisher read to the jury and was admitted as an exhibit.  Rodriguez wrote:

> I punch a guy one time then I ran but I did not rob no one.  Didn't take [illegible]
> or hit him with a brick.  I am sorry for punching him, but I didn't want it to go
> like that I didn't take anything from that guy. I only punch with my hand, not a
> brick.  When I punched the guy I heard people screaming, so, I ran.  When I got
> too long [sic] we got on a cab and that [sic] when we got arrested.  I don't know
> what was taken from that guy and I didn't not hundred percent. [sic].  No one took
> from him anything.  (667).

There was no defense objection.

### F.    Summations, Charge and Deliberations

On summation, petitioner's counsel seized the opportunities presented by the flawed

police investigation, highlighting the failure to recover the stolen cash or Pucci's belongings and

the apparent absence of blood on petitioner's clothes.  She also emphasized Pucci's failure to

make a positive trial identification at trial and urged jurors to reject the show-up identification

citing his compromised physical condition and the suggestiveness of Pollard having told Pucci

he was being taken to identify the people who beat him.  Counsel further argued that Pucci "was

terrified" by the police presence and had "no fear greater … than being discovered by law

enforcement that he is here illegally" (761), suggesting that Pucci "would have identified

[anyone]" to "get out of there quickly" and get to the hospital.  (761).[10]

Finally, rather than press the theory advanced in petitioner's statement—that he was only

trying to break up a fight between Rodriguez and another individual—counsel argued that

Detective Fischer's entire account of petitioner's statement was suspect.  She reminded the jurors

---

[10] Pucci had testified that he was in the country illegally (524) and that he had a wife and five
children living in Ecuador, whom he had not seen for 12 years, to whom he sent money weekly.
(462-63).

11

that the interrogation was unwitnessed and unrecorded and that Fischer had already learned from Pollard the key details of the crime before the interrogation. She further argued that, although Fisher testified that petitioner did not memorialize his oral statement in writing because he said he could not write, Fisher should have written it down and read it back to him but instead did not memorialize it in his own notes for several days. In sum, she argued, petitioner's statement "is not worth the paper it is not written on." (770). Her summation did not address Rodriguez's statement.

The prosecution addressed Rodriguez's and petitioner's statements as follows:

> I submit to you that the defendants themselves admitted, yes, we were there with these statements, it was us. What they did do, I submit to you through these statements, is say, hey, wait a minute. Yes it was us, but it was just a fight. Mr. Rodriguez says, I only punched him once. It was us, but I only punched him once. (807)

Both Rodriguez's and petitioner's attorneys objected to these remarks as a "mischaracterization" of the statements, but the objection was overruled. The prosecutor repeated, "I submit to you that this is what these statements mean." (807). On the subject of identification, the prosecutor also referred to "the testimony about the citizens that were on the street" and, conceding that "it's not in the record," asked the jurors "to make reasonable inferences from the evidence that [was] provided. . . . submit[ting]… that these two defendants never left the eyes of those citizens." (804).[11]

The robbery and assault charges were submitted to the jury under an acting-in-concert theory. The court's charge included a general instruction that the jury consider the case as two

---

[11] The prosecutor did not refer to McMenamin's testimony, in response to the Court's question, that the second radio call taking him to Dunkin Donuts was related to the Pucci attack.

trials in one and evaluate the evidence and instructions on the law separately as to each defendant.  Petitioner's attorney did not request, and the court did not deliver, an instruction advising the jury that Rodriguez's statements were not to be considered as evidence against petitioner.

During deliberations, which spanned four days, the jurors asked for a readback of Fischer's testimony regarding each defendant's statements, and portions of the testimony of Pucci (the victim) and Pucha (the witness).

## II.    The Appellate Division Decision

The Appellate Division rejected petitioner's Confrontation Clause claim as unpreserved and alternatively, on the merits.  People v. Gilocompo, 125 A.D.3d 1000, 1001 (2d Dep't 2015), lv. app denied, 25 N.Y.3d 1163 (2015).  Citing New York's contemporaneous objection rule, C.P.L. § 470.05, the Court held, first, that "[petitioner] failed to preserve for appellate review his contention that his Sixth Amendment right to confrontation under Bruton v. United States [ ] and Crawford v. Washington [ ] was violated by the admission into evidence of statements made by a nontestifying codefendant to a detective following the codefendant's arrest, as well as by certain remarks made by the prosecutor during summation that were related to those statements."  Id.

Alternatively, the Appellate Division held that, "in any event, those contentions are without merit."  Id.   The Court determined that, "[w]ith respect to the challenged statements, each one, taken individually, did not directly implicate [petitioner]."  Id.  The Court continued: "[f]urthermore, for the same reason, [petitioner's] contentions about the remarks made by the prosecutor in summation, which, in effect, reiterated the statements at issue, are also with merit."  Id.  The court concluded that the challenged prosecutorial "remarks constituted fair comment on

13

the evidence." Id.

In his appellate brief petitioner also argued that counsel was ineffective, claiming that despite her pre-trial Crawford objection, she was deficient in acquiescing to an insufficient redaction of Rodriguez's oral statements, in failing to address Rodriguez's written statement, in failing request a jury instruction (or to argue on summation) that Rodriguez's statements were not admissible as evidence against petitioner, and in failing to object to the prosecution's use of the statements during its summation.  The Appellate Division rejected this claim on the merits, summarily, in holding that petitioner's "remaining contentions are without merit."  Id.

**DISCUSSION**

**I.   General Habeas Standards**

When the Appellate Division has denied a petitioner's claim on the merits, the sole question before this Court ordinarily is whether that decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1), as amended by the Antiterrorism and Death Penalty Act of 1996 ("AEDPA").  For purposes of habeas review, "clearly established Federal law" refers to holdings of the United States Supreme Court, and not an appellate court's interpretation or extension of such holding.  See Carey v. Musladin, 549 U.S. 70, 74 (2006) ("[C]learly established Federal law ... refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." (internal quotation and citation omitted).  See also Rodriguez v. Miller, 537 F.3d 102, 109 (2d Cir. 2008) ("[I]n the past we (and other courts) occasionally have relied on our own precedents to interpret

14

and flesh out Supreme Court decisions to decide variegated petitions as they come before us. It would appear that we can no longer do this."), cert. denied, 552 U.S. 1262 (2008).

A state court decision is "contrary to" clearly established federal law if a state court: (1) "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law;" or (2) "decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 402, 405 (2000).

An "unreasonable application" of federal law under AEDPA "means that a state court's ruling must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Shoop v. Hill, 139 S. Ct. 504, 506 (2019) (internal quotations and citations omitted). See also Virginia v. Le Blanc, 137 S. Ct. 1726, 1728 (2017) ("In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice") (internal quotations and citations omitted); Orlando v. Nassau Cty. Dist. Attorney's Office, 915 F.3d 113, 121 (2d Cir. 2019) ("unreasonable application" standard of § 2254(d)(1) is a "bar [that] is not reached where fairminded jurists could disagree on the correctness of the state court's decision") (internal quotation and citation omitted), cert. denied, 140 S. Ct. 2792 (2020) (internal quotation marks and citations omitted); Harrington v. Richter, 562 U.S. 86, 102 (2011) ("It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable"); but see Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015) ("As we have also observed, however, even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief") (internal quotation marks, citation and alterations omitted).

15

## II.      The Procedural Bar

Petitioner agrees that the Appellate Division's rejection of his confrontation claim in the first instance as unpreserved constitutes an independent and adequate state law ground that ordinarily bars habeas review.  See generally Davila v. Davis, 137 S. Ct. 2058, 2064 (2017); Coleman v. Thompson, 501 U.S. 722, 729 (1991).[12]  This bar applies "even where," as here, "the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990); see also Harris v. Reed, 489 U.S. 255, 264 n. 10, (1989) ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.") (emphasis in original).

The bar erected by the independent and adequate state law doctrine may be lifted only in the rare instance where a petitioner demonstrates both "cause" for failing to comply with the state preservation requirement and "actual prejudice" if the claim is not reached (*i.e.*, that the claim has merit), or that a fundamental miscarriage of justice will occur if the court does not review the claim because he is actually innocent.  See generally Harris, 489 U.S. at 262; Murray v. Carrier, 477 U.S. 478, 485 (1986); Wainwright v. Sykes, 433 U.S. 72 87 (1977).  The requisite cause and prejudice may be shown by a meritorious ineffective assistance of counsel claim.  See,

---

[12] A state procedural bar "is 'adequate' if it 'is firmly established and regularly followed by the state in question' in the specific circumstances presented." Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007) (internal quotation and citation omitted), cert. denied, 552 U.S. 1150 (2008) (quoting, Monroe v. Kuhlman, 433 F.3d 236, 241 (2d Cir. 2006)). The requirement that an issue be preserved by contemporaneous objection as required by NY CPL § 470.05(2) is a firmly established and regularly followed rule for these purposes. Richardson v. Greene, 497 F. 3d 212, 217-18 (2d Cir. 2007); Petronio v. Walsh, 736 F. Supp. 2d 640, 653 (E.D.N.Y. 2010).

e.g., Tavarez v. Larkin, 814 F.3d 644, 650 (2d Cir. 2016) ("There is no doubt that ineffective assistance of counsel can serve as cause to excuse a procedural default.")  Petitioner raises his ineffectiveness claim here for this purpose.

As noted, the Appellate Division disposed of petitioner's ineffectiveness claim summarily as one of his "remaining contentions [that] are without merit."  Gilocompo, 125 A.D.3d at 1001.  The controlling Supreme Court law on ineffectiveness is the familiar framework announced by Strickland v. Washington, 466 U.S. 688 (1984), a standard that is "highly demanding."  Kimmelman v. Morrison, 477 U.S. 365, 382 (1986).  See also Padilla v. Kentucky, 559 U.S. 356, 371 (2010)  ("[s]urmounting Strickland's high bar is never an easy task").  Further, "[b]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."  Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).  Finally, "[e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult [because] [t]he standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so").  Harrington, 562 U.S. at 105 (internal quotation and citation omitted).  See also Cullen v. Pinholster, 563 U.S. 170, 190 (2011) ("review of [state court]'s decision is ... doubly deferential [because] [w]e take a highly deferential look at counsel's performance [under Strickland] through the deferential lens of § 2254(d)") (internal quotations and citations omitted).

The Second Circuit has not decided whether AEDPA deference or *de novo* review applies when a claim of ineffective assistance rejected by the state court is advanced as cause to excuse a procedural default rather than as a separate basis for habeas relief.  Tavarez, 814 F.3d at 650 (acknowledging circuit split on the question); Miller v. Warden of Sing Sing, 803 Fed. App'x

17

493, 496 (2d Cir. Mar. 12, 2020) (citing <u>Tavarez</u> approvingly).  This Court reads the Supreme

Court's most recent treatment of ineffectiveness in the habeas context, however, as a caution

against exploiting a potential loophole in the clear mandate of deference required by AEDPA.

<u>See</u> <u>Shinn v. Kayer</u>, 141 S. Ct. 517, 523 (Dec. 14, 2020) (*per curiam*) (reversing Ninth Circuit's

application of "de novo masquerading as deference approach") (internal quotation and citation

omitted).  Notably, <u>Shinn</u> explains that the Supreme Court has "recognized the special

importance of the AEDPA framework in cases involving <u>Strickland</u> claims" in part because

"[such] claims can function as a way to escape rules of waiver and forfeiture."  <u>Id.</u> at *4 (internal

quotation and citation omitted).

        Under <u>Strickland</u>, a petitioner must show that "counsel's representation fell below an

objective standard of reasonableness," <u>Strickland</u>, 466 U.S. at 688, and "a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." <u>Id.</u>  at 694.  On the first prong, "[j]udicial scrutiny of counsel's performance must be

highly deferential," <u>id.</u> at 693, requiring the court to apply a "strong presumption" that counsel's

representation was within the "wide range" of reasonable professional assistance.  <u>Id</u>. at 689.  To

prevail, a petitioner must show "that counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u>, at 687.

Further, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were

reasonable. The question is whether there is any reasonable argument that counsel satisfied

<u>Strickland</u>'s deferential standards." <u>Harrington</u>, 562 U.S. at 105 (emphasis added). <u>See</u> <u>also</u>

<u>Cullen</u>, 563 U.S. at 196 (attorney need not state his reasons; rather, the court must "affirmatively

entertain the range of possible reasons [ ] counsel may have had for proceeding as [he] did")

(internal quotation marks omitted); <u>Greiner v. Wells</u>, 417 F.3d 305, 320 (2d Cir. 2005) (court

must "look for legitimate justifications for [counsel's] conduct, including justifications transparent on the record and justifications offered by counsel").

With respect to prejudice, "a reasonable probability" of a different result is "a probability sufficient to undermine confidence in the outcome." Id., at 694.  See also id. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.").  "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." Harrington, 562 U.S. at 104 (internal citation and quotation omitted).  Rather, "[c]ounsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. (internal citation and quotation omitted).  See also id. at 111-12 ("The likelihood of a different result must be substantial, not just conceivable") (internal quotations and citations omitted).

As treated in the parties' briefs, whether petitioner has established cause and prejudice through his Strickland claim merges, as a practical matter, into the merits of the confrontation claim.  In other words, the parties treat the question of whether counsel was deficient for purposes of Strickland (and thus whether "cause" exists to lift the procedural bar) as synonymous with whether petitioner suffered a violation of his confrontation rights as a result of counsel's conduct; likewise, they treat Strickland "prejudice" as equivalent to whether any such constitutional violation was harmless.

Despite its appealing logic, given the imposing Strickland standard the Court is not convinced that the inquiries merge in quite this manner.  Certainly, logic also requires that, before the Court address the merits of a claim, it first declare whether the claim is properly before it.  In this case, however, the gravamen of this Court's Strickland analysis follows from its

19

assessment of the nature of the substantive confrontation jurisprudence it is claimed counsel

mishandled.  To avoid needless repetition, therefore, the Court states here its conclusion that the

cause and prejudice required to lift the procedural bar have not been established and so the

confrontation clause remains barred from habeas review.   The Court proceeds to address the

merits of the confrontation claim in any event and its Strickland-specific reasoning appears there.

See infra at notes 14 and 17.


**III.    The Confrontation Claim**

Petitioner's first line of argument is that the Appellate Division's rejection of his claim is

"contrary to" Crawford v. Washington, 541 U.S. 36 (2004).  There, the Supreme Court held that

the Confrontation Clause categorically prohibits admission in a criminal trial of out-of-court

statements that are "testimonial" in nature unless that witness is both unavailable and the

defendant had a prior opportunity to cross-examine the witness.  Id. at 67, 68-69.  See United

States v. Stewart, 433 F.3d 273, 290 (2d Cir. 2006). (Crawford "announced a per se bar on the

admission of a class of out-of-court statements, denominated 'testimonial,' against an accused

who had no prior opportunity to cross-examine the declarant").  "Testimonial" includes

statements made during "police interrogations."  Id. at 68.  Petitioner argues, and respondent

concedes, that Rodriguez's oral and written statements are testimonial because Rodriguez made

them during a police interrogation, Rodriguez was not available (because he did not testify), and

petitioner had no opportunity to cross-examine him before trial.

The missing element in this analysis, however, is the crucial threshold question of

whether the challenged Rodriguez statements accuse petitioner of a crime.  See, e.g., Ryan v

Miller, 303 F.3d 231, 247 (2d Cir. 2002) (comparing the rights under the Confrontation Clause

with the "intertwined" rules prohibiting hearsay, explains that "[t]he Confrontation Clause *targets only that testimony that that contains accusations against the defendant*") (emphasis added). See also id. at 237 ("the crux of the [confrontation clause] right is that the government cannot introduce at trial statements containing *accusations against the defendant* unless the accuser takes the stand against the defendant and is available for cross-examination") (emphasis added).

The out-of-court statement in Crawford, made by the defendant's wife who did not testify due to marital privilege, was plainly accusatory because it contradicted the defendant's claim that the man he killed was armed; the decision, therefore, does not address the threshold issue of *whether* an out of court statement is accusatory.  Instead, this Court is guided (as is the heart of petitioner's habeas argument) by the line of pre-Crawford Supreme Court cases, beginning with Bruton v. United States, 391 U.S. 123 (1968), that address accusatoriness for Confrontation Clause purposes in the context presented here.

Bruton held that, in a joint trial, the admission of an accomplice confession that "expressly implicat[ed]" the defendant violated the defendant's confrontation rights, even when jurors were instructed that they could consider the confession only as evidence against the confessor but not the other defendant.  Id. 391 U.S. at 137.  The emerging practice of protecting confrontation rights by redacting the accusatory portion of the accomplice confession, which Bruton noted with some skepticism, id. at 135, n.10, was addressed in Richardson v. Marsh, 481 U.S. 200 (1987).  There, the admitted out-of-court confession was redacted to "omit all reference" to the defendant and "all indication that *anyone* other than . . . [the confessor and a third person] had participated in the crime," id. at 203 (emphasis in original), and the jury was instructed that it could not consider the confession as evidence against the other defendant.  Id. at

21

203.  Declining to "extend [Bruton] further," the Court in Richardson "h[e]ld that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."  Id. at 211. The Court explained that, "[o]rdinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant."  Id. at 206.

Tackling the issue of potential inferential incrimination, Richardson explained that "[i]n Bruton, the codefendant's confession 'expressly implicated the defendant as his accomplice," so "there was not the slightest doubt that it would prove powerfully incriminating," whereas "in this case the confession was *not incriminating on its face*," but only "*became*" incriminating "*when linked with evidence introduced later at trial*," which included the defendant's own testimony Id. at 208 (internal quotations and citations omitted) (emphasis added).  Richardson reasoned that, "[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence."  Id.

The Supreme Court further explained the holdings of Bruton and Richardson in Gray v. Maryland, 523 U.S. 185 (1998), which involved an accomplice confession that was redacted to replace the defendant's name with a blank space or the word "deleted."  Although the jury was instructed to consider the confession as evidence only against the accomplice, the Court held that such statements "considered as a class, so closely resemble Bruton's unredacted statements that, in our view, the law must require the same result because such statements are still "directly accusatory."  Id. at 192, 194 (internal citation and quotation omitted).  Addressing Richardson,

22

the Court in Gray acknowledged that a jury "must use inference to connect the statement in [the] redacted confession with defendant," but explained that Richardson did not govern the result there because "[i]nference pure and simple cannot make a critical difference." Id. at 195.  The Court explained: "Richardson must depend in significant part upon the *kind* of, not the simple *fact* of, inference.  Richardson's inferences involved statements that did not refer directly to the defendant himself and which became incriminating only when linked with evidence introduced later at trial."  Gray, 523 U.S. at 196 (internal quotations, citations, and alternations omitted).

The Court concludes that the Appellate Division did not unreasonably apply these Supreme Court holdings when rejecting petitioner's confrontation claim.  Indeed, the Appellate Division's determination that "each" of the "challenged statements [of Rodriguez], taken individually, did not directly implicate" petitioner, Gilocompo, 125 A.D.3d at 1001, is not only not unreasonable: it is correct.  The trial court excluded the portion of Rodriguez's oral statement that directly accused petitioner of instigating the crime.  The admitted redacted portion merely says that petitioner was at the scene with Rodriguez, and the written statement says only that petitioner left the scene with Rodriguez, facts that were essentially undisputed and established by other evidence including petitioner's own admission.  They are thus not directly accusatory within the meaning of Bruton and its progeny.

For the same reason, the Appellate Division's rejection of petitioner's claim was not "contrary to" Crawford which, as noted, is distinguishable because it involved a directly accusatory out-of-court statement.  See Williams, 529 U.S. at 402, 405 (a state court decision is "contrary to" clearly established federal law if, inter alia, a state court  "decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.").

Petitioner, however, emphasizes the *inferentially* incriminating nature, or potential, of Rodriguez's statements in arguing that, without a limiting instruction, those statements were evidence against him for purposes of the Confrontation Clause and in violation of Crawford and the Bruton line of cases.  The Court disagrees.  Petitioner admits that he was present at the scene, that he was part of the fracas and that he fled in a taxi; petitioner and Rodriguez were apprehended together; and the victim identified them moments later.  The only real issue was whether petitioner was part of the assault or, as he claimed in his statement, only trying to break up a fight between Rodriguez and Pucci.  Neither of Rodriguez's statements speak to that subject, even inferentially.

Further, even if the challenged statements arguably carried some inferentially incriminating potential, that potential was speculative and marginal at most,[13] and not enough to establish that the Appellate Division's decision was *unreasonable within the meaning of AEDPA*.  See Shoop, 139 S. Ct. at 506 (2019) ("unreasonable application" of federal law under AEDPA "means that a state court's ruling must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement (internal quotations and citations omitted); Le Blanc, 137 S. Ct. at 1728 ("In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling

---

[13] For example, when linked with the police testimony of the apprehension and arrest, Rodriguez's statement that "we got on a cab" and that that was "when we got arrested" arguably adds a degree of concertedness not present in Rodriguez's oral statement and arguably accuses petitioner inferentially of joint flight suggestive of a joint consciousness of guilt.  Nevertheless, the prosecution did not make this argument or argue that Rodriguez's statement was evidence of petitioner's guilt.

24

must be objectively unreasonable, not merely wrong; even clear error will not suffice") (internal quotations and citations omitted).

Importantly, "[w]hen assessing whether a state court's application of federal law is unreasonable, 'the range of reasonable judgment can depend in part on the nature of the relevant rule' that the state court must apply." Renico v. Lett, 559 U.S. 766, 776 (2010) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Thus, "'the more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges— 'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" Renico, 559 U.S. at 776 (quoting Yarborough, 541 U.S. at 664) (internal alteration omitted).

Certainly Bruton, Richardson and Gray, as a group, announce a "more general" rather than specific rule, and between Richardson and Gray lies a range of reasonable judgment as to where a confession falls on the spectrum of potential inferential incrimination. And, in a case such as this—involving statements that are not directly accusatory—fair-minded jurists could well disagree about exactly what the holdings require with respect to redaction and a limiting instruction. Indeed, in Richardson, the Supreme Court acknowledged, with respect to confessions that might "become" incriminating only when linked with other evidence, that efforts to effect Bruton-compliant redaction are notoriously imprecise and, further, that the admissibility decision can be difficult to get right in advance of trial. As the Court explained:

> [E]vidence requiring linkage differs from evidence incriminating on its face in the practical effects which application of the *Bruton* exception would produce. If limited to facially incriminating confessions, *Bruton* can be complied with by redaction—a possibility suggested in that opinion itself. If extended to confessions incriminating by connection, not only is that not possible, but it is not even possible to predict the admissibility of a confession in advance of trial. The "contextual implication" doctrine articulated by the Court of Appeals would presumably require the trial judge to assess at the end of each trial whether, in light of all of the evidence, a nontestifying codefendant's confession has been so

25

"powerfully incriminating" that a new, separate trial is required for the defendant. This obviously lends itself to manipulation by the defense—and even without manipulation will result in numerous mistrials and appeals. It might be suggested that those consequences could be reduced by conducting a pretrial hearing at which prosecution and defense would reveal the evidence they plan to introduce, enabling the court to assess compliance with *Bruton* ex ante rather than ex post. If this approach is even feasible … it would be time consuming and obviously far from foolproof.

Id. at 208-209.

The final matter to consider is the branch of petitioner's argument that emphasizes the absence of a limiting instruction advising the jurors not to consider Rodriguez's statements as evidence against petitioner.  Although the role of such an instruction in some joint trials is embedded in the discussions and holdings of Bruton, Richardson, and Gray, the cases employ the word "ordinarily" rather than categorically.  See, e.g., Richardson, 481 U.S. at 206 ("Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant."); Cruz, 481 U.S. at 190 (same).  Further, in this case, as discussed, the only real issue was whether petitioner was involved in the assault or only trying to break up a fight, and neither of Rodriguez's statements speak to that matter.  The limiting instruction would have made little sense and might well have struck the jury as suggestively odd.

Certainly, therefore, the Appellate Division did not unreasonably apply the "holding" of a Supreme Court case, Musladin, 549 U.S. at 74, when rejecting petitioner's claim that the admission of Rodriguez's statements without a limiting instruction violated his rights under the Confrontation Clause.[14]

---

[14]For these same reasons, the Appellate Division did not unreasonably apply the Strickland deficiency standard when rejecting petitioner's ineffectiveness claim.  Of note, counsel did

26

In any event, as the Court now addresses, even if a violation of petitioner's confrontation rights occurred, any such error was harmless.

## IV.     Harmless Error Analysis

Violations of the Confrontation Clause are subject to harmless error analysis.  United States v. Acosta, 2020 WL 6389962, *6 (2d Cir. Nov. 2, 2020).  See also Reid v. Martuscello, 2020 WL 3618737,  *8 (E.D.N.Y.  July 2, 2020) ("It is well established that Bruton violations are subject to harmless error analysis") (collecting authorities).  In habeas proceedings, "the standard for determining whether a conviction must be set aside because of federal constitutional error" is whether that error "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 622 (1993) (internal quotations and citation omitted).   The requires a petitioner to show "actual prejudice." Id. at 637.  See also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial

---

secure exclusion of the portion of Rodriguez's statement that directly accused petitioner of instigating the crime.  She thereafter executed the legitimate strategy of electing to call no further attention to the statements, either through objection during Detective Fischer's testimony or by an instructing limiting their use.  Her defense theory as reflected in the compelling arguments marshaled during summation (that her client's connection to the incident was not established) would not have been advanced by drawing attention to Rodriguez's statement.   Even if this strategy was arguably at odds with some feature of the Bruton jurisprudence, it would not have been an unreasonable application of Strickland for the Appellate Division to have concluded that counsel's handling of the Rodriguez statements fell within the range of competent lawyering, given the features of the Bruton jurisprudence discussed.  In short, counsel did not "ma[k]e errors so serious that she was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Strickland, 466 U.S. at 687.

and injurious effect" standard set forth in <u>Brecht</u> [ ] whether or not the state appellate court recognized the error and reviewed it for harmlessness under the [former federal standard]")

      As recently summarized by another member of this Court,

> The Second Circuit weighs several factors in assessing whether the <u>Brecht</u> standard has been met, including the strength of the prosecution's case and whether the evidence admitted in error was crucial, critical, or highly significant. The prosecution's case may be the most significant factor, but the court need only find the prosecution's case to be weighty, not overwhelming.  Moreover, to conclude that the error was harmless ... we need not find that the improperly admitted evidence had no effect at all, we need only find that the effect was not substantial and injurious.

<u>Reid</u>, 2020 WL 3618737 at *8 (internal quotations, citations and alterations omitted).

      Even if the admission of the challenged Rodriguez statements without a limiting instruction did violate petitioner's confrontation rights, the Court finds any error to be harmless in light of overall strength of the state's case, in particular the victim's account and petitioner's own statement.[15]

      Under New York law, "[a] person is guilty of robbery in the second degree when he forcibly steals property and when," in relevant part, "[h]e is aided by another person actually present; or . . . [i]n the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . [c]auses physical injury to any person who is not a participant in the crime." N.Y. Penal Law §160.10.   "A person is guilty of assault in the second degree when . . . "[w]ith intent to cause serious physical injury to another person, he

_____

[15] In <u>Cruz v. New York</u>, 481 U.S. 187 (1987), the Supreme Court held that the interlocking or corroborative nature of a non-testifying confession and a defendant's own statement does not render the confession "reliable" or otherwise serve as grounds for bypassing the <u>Bruton</u> rule but instead "may be considered on appeal in assessing whether any Confrontation Clause violation was harmless."  <u>Id.</u> at 194.

causes such injury to such person or to a third person; or … [w]ith intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument."  N.Y. Penal Law § 120.05.

The prosecution's case was weighty and sufficient to establish petitioner's guilt of these crimes without the Rodriguez statements.  The victim's account, including his prompt identification of petitioner and Rodriguez at the show-up, was lengthy, exhaustively tested on cross-examination, clarified by questions from the trial court, and ultimately both compelling and credible.  The victim's certainty about his initial identification remained intact, and there is no dispute that the individuals he identified at the show-up were the two defendants on trial.  His candor in admitting that by the time of trial he could no longer identify his attackers no doubt weighed in favor of his overall credibility.  Despite the absence of testimony from the neighbor who assisted him or the neighbors who chased the assailants, one neighbor, Pucha, did corroborate the signature particulars of Pucci's account, including that the assailants reached into his pockets, that he was struck with something that looked like a rock, and that two other individuals were chasing the fleeing assailants.  Although petitioner emphasizes that the deliberating jurors asked for readbacks of Fischer's testimony as to Rodriguez's and his statements, the jurors also asked for readbacks of portions of Pucci's and Pucha's testimony.

Petitioner's statement was also important and compelling evidence negating his claim in summation that nothing connected him to the crime.[16]   Labelled his "misidentification" defense

---

[16] To be sure, in summation counsel exploited the available arguments to suggest that the statement was never made but there is no dispute that petitioner's signature appeared on the Miranda waiver form; further, there was no reasonable basis for petitioner's apparent claim that, from the total body of law enforcement testimony, the jury should have selected for disbelief the portion of Detective Fisher's testimony that recounted petitioner's statement.  Absent that

in his briefing here, that defense was fragile from the outset.  Petitioner' presence with Rodriguez at the scene of the crime is not in genuine dispute.  His involvement in the fracas is firmly established by his own explanation and he was arrested with Rodriguez moments after the crime when the fleeing cab was pointed out to the police.  The only question is whether he took part in the attack or only sought to break it up, and Rodriguez's statements, as discussed, are silent on that subject.  Whether those statements had any of the speculatively inferentially incriminating potential petitioner suggests, they certainly did not have a "substantial and injurious" effect on the verdict.  Brecht, 507 U.S. at 622.

Finally, the law enforcement testimony describing why and how petitioner and Rodriguez were apprehended, when combined with Pucci's compelling testimony, its corroboration by Pucha, and petitioner's admissions, only further undermined the defense of misidentification. Despite the absence of testimony from the neighbor who assisted petitioner and the neighbors who chased the assailants, the police testimony clearly established that petitioner's and Rodriguez's flight, the pursuit by law enforcement, and their apprehension together, all occurred within minutes of the crime and within a confined geographical zone of several city blocks. Although the jury did not hear that Lopez was one of the neighbors who chased the fleeing assailants, the inference was not only available, but obvious.

For all these reasons the Court finds that any violation of petitioner's confrontation rights was harmless and does not require the extraordinary remedy of habeas relief.[17]

---

remotest of possibilities, there was no bona fide basis for the misidentification defense that petitioner claims was sabotaged by the Rodriguez statements.

[17] For these same reasons, the Appellate Division did not unreasonably apply the Strickland prejudice standard when rejecting petitioner's ineffectiveness claim.  To be sure, the tests for Strickland prejudice and harmless constitutional error are not identical but here, as a practical

**CONCLUSION**

For all the foregoing reasons, the application of petitioner Lazaro Gilocompo for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254 is denied in its entirety.  Because petitioner has not

"made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a

certificate of appealability shall not issue.

SO ORDERED.

Dated: Brooklyn, New York
        February 2, 2021


　　 /S/ Raymond J. Dearie　
RAYMOND J. DEARIE
United States District Judge

_____

matter, they merge.  Necessarily, where any constitutional violation for which counsel's errors
are said to be responsible is harmless, Strickland prejudice is lacking.

31